PARENTS UNITED FOR BETTER
SCHOOLS, INC., et al.,
Plaintiffs,

v.

SCHOOL DISTRICT OF PHILADEL-
PHIA BOARD OF EDUCATION,
et al., Defendants,

and

Jamil Doe, et al., Intervenor–Defendants.

Civil Action No. 96–3791.

United States District Court,
E.D. Pennsylvania.

Sept. 12, 1997.

Dennis M. Abrams, Lowenthal & Abrams, Bala Cynwd, PA, for Plaintiffs.

Glenna Hazeltine, Philadelphia, PA, Albert G. Bixler, Deborah Weinstein, Connolly, Epstein, Chicco, Foxman, Engelmyer and Ewing, Philadelphia, PA, Lisa Landau, American Civil Liberties Union, New York City, for Intervenors–Defendants.

Glenna Hazeltine, Philadelphia, PA, Albert G. Bixler, Deborah Weinstein, Connolly, Epstein, Chicco, Foxman, Engelmyer and Ewing, Philadelphia, PA, Laura Abel, American Civil Liberties Union, New York City, for Defendants.

## OPINION

GAWTHROP, District Judge.

This cause of action challenges the legality of a condom distribution program in Philadelphia public high schools. Pending before the court are Motions for Summary Judgment filed both by the defendants and by the intervenors. The movants argue that the Philadelphia School District's Board of Education has the authority to implement the condom program, which fully complies with state law. They further contend that this voluntary program does not infringe the parents' Fourteenth Amendment rights, and that any prior parental consent requirement would infringe the students' privacy rights. They also argue that Plaintiffs cannot maintain a private cause of action under the cited criminal statutes. I agree and shall grant their motions.

## I. Background

On June 24, 1991, at a public meeting, held after nine public hearings, the Board of Education of the School District of Philadelphia adopted Policy 123 on "Adolescent Sexuality." Designed to address the problems of pregnancy and sexually transmitted diseases among students, Policy 123 directs the Superintendent of Schools to develop broad-based curricula to promote healthy behavior. Specifically, the curricula should "convey the message that abstinence is the most effective way of preventing pregnancy, sexually transmitted diseases and HIV infection" and should include "a voluntary parental education component, designed to enhance the frequency and effectiveness of parents' communication with their children...." Policy 123 § 3.1. In addition, for those students who are sexually active, Policy 123 establishes a pilot program permitting in-school distribution of condoms with mandatory counseling ("the condom program"). Policy 123 § 3.5. Student participation in the condom program is voluntary, and "[p]arents or guardians of students in schools taking part in the phased-in pilot program shall have the absolute right to veto their child's or children's participation in the program." Policy 123 § 4.1. The Board of Education adopted Policy 123 "[p]ursuant to its authority under the Educational Supplement to the [Philadelphia] Home Rule Charter...." Policy 123 ¶ 2.1.

The condom program began in three schools on December 17 and 18, 1991,[1] and currently exists in nine Philadelphia public high schools. When students enter any of these schools, the school sends letters to their parents or guardians, informing them of the condom program and instructing them to return an enclosed "opt-out" form if they do not want their child to have access to condoms in school. These letters refer to the condom program as a "health service" and state that students who request condoms will be given counseling and education from "a doctor, a nurse or a social worker." However, only 21% of 100 randomly surveyed members of Parents United for Better Schools, Inc. ("PUBS") said that they remembered receiving an opt-out letter. In addition, when new centers are opened, notice is published in area newspapers and on the School District's television channel.

Each time a student requests condoms, a counselor determines whether an executed parental opt-out form is on file for that student. If the parent has returned an opt-out form, the counselor will not give the student condoms. If no form is on file, the counselor discusses the virtues of abstinence with the student, and, should the student still wish to receive condoms, the counselor will give the student condoms after providing instructions on their proper use.

The health resource centers are staffed primarily by counselors and social workers. The centers have no medical equipment, but rather are furnished with a desk, chairs, and tables stacked with health pamphlets. These centers offer students written information and professional counseling on abstinence, sexually transmitted diseases, relationships, and pregnancy. In the 1995–96 school year, 5,400 students visited the health resource centers at which condoms are available. Seventy-five percent of those students received condoms. During that same period, counselors made 686 referrals to health care providers for sexually transmitted diseases, HIV screening, or treatment, and made 984 referrals to health care providers for pregnancy or birth control needs. .

The School District administers the condom program through partnerships with health care and social service providers. The School District does not use any of its own funds for the condom program. Rather, funding for these centers comes from private and non-School District public sources, including the Philadelphia Department of Health, and federal grants under Title X of the Public Health Service Act, 42 U.S.C. § 300(a).

On January 13, 1992, PUBS and several individual parents filed a complaint in the Philadelphia County Court of Common Pleas against the School District of Philadelphia's Board of Education, the Board of Education's President, and the School District's Superintendent of Schools. The plaintiffs requested a declaratory judgment that the condom program was "unlawful and invalid," an injunction prohibiting the distribution of condoms in Philadelphia public schools, and an order mandating the implementation of an abstinence program. On November 10, 1992, the Court of Common Pleas granted the defendants' Motion for Summary Judgment, holding that, because Policy 123 provided for a parental veto of a student's participation, the plaintiffs lacked standing. *Parents United for Better Schools, Inc. v. School Dist.,* 17 Pa. D. & C. 4th 325 (Com.Pl.1992). The Pennsylvania Commonwealth Court reversed and remanded, holding that the plaintiffs have standing in Pennsylvania courts because they have an interest in giving express consent before their children receive medical-treatment. *Parents United for Better Schools, Inc. v. School Dist.,* 166 Pa.Commw. 462, 646 A.2d 689 (1994) (*en banc*). The Commonwealth Court, however, did not determine whether condom distribution constitutes medical treatment. *Id.,* 646 A.2d at 691 n. 3.

On June 1, 1995, the Court of Common Pleas allowed several individuals and organi-

---

1. The plaintiffs maintain that the defendants began in-school distribution of condoms before adopting an abstinence curriculum designed to meet Policy 123's mandates. The plaintiffs acknowledge that an abstinence curriculum is now in place.

zations to intervene as defendants.[2] In March, 1996, the intervenors and the defendants filed separate motions for summary judgment, which the Court of Common Pleas summarily denied. In opposing the defendants' Motion for Summary Judgment, Plaintiffs relied on allegations that federal substantive due process gives them the right to raise their children as they see fit. That federal claim prompted the intervenors and the defendants to remove this case to federal court on May 17, 1996. This court denied Plaintiffs' swiftly ensuing Motion to Remand. *Parents United for Better Schools, Inc. v. School Dist.*, No. 96–3791, 1996 WL 442887 (E.D.Pa. July 31, 1996).

Now, after a goodly amount of discovery, Defendants' and Intervenors' Motions for Summary Judgment are before the court. They argue that the condom program is within the Board of Education's authority and discretion, that it complies with Pennsylvania law, and that this voluntary program does not unconstitutionally burden parental rights under the Fourteenth Amendment. To the contrary, they maintain that, were the situation otherwise, any express parental consent requirement would violate federal law and students' privacy rights. Plaintiffs counter that the condom program burdens their constitutional liberty interest in raising their children as they see fit. They argue that any limits on parental liberty should be subject to strict scrutiny, and that the current opt-out provision fails to pass constitutional muster in that it burdens them with an affirmative duty to act, or else. Plaintiffs also contend that the condom program is invalid under Pennsylvania law because the Board of Education lacks the authority to implement a new health service without express legislative approval. Finally, in their Complaint, Plaintiffs maintain that condom distribution endangers the welfare of their children, but they omit that argument from responses to the summary judgment motions.

## II. *Standard of Review*

In considering a motion for summary judgment, the court must determine "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Only facts that may affect the outcome of the case under applicable law are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court does not resolve factual disputes or make credibility determinations, and must view facts and inferences in the light most favorable to the party opposing the motion. *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995). Although the movant has the initial burden of demonstrating an absence of genuine issues of material fact, the non-movant then must establish the existence of each element on which it bears the burden of proof. *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir.1990), *cert. denied*, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). Unless evidence in the record would permit a jury to return a verdict for the non-movant, there are no issues for trial, and summary judgment becomes appropriate. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. It appearing to the Court that the issues here are not factual, but rather questions of law, summary judgment is appropriate.

## III. *Discussion*

### A. *Board of Education's Authority to Enact Condom Program*

#### 1. **Generally**

Plaintiffs contend that the Board of Education exceeded its statutory authority by implementing the condom program.[3] The

**2.** Specifically, the intervenors include: students who attend schools which participate in the condom program; parents of students in such schools; and ActionAIDS, Inc., the Family Planning Council, and Planned Parenthood Southeastern Pennsylvania, all organizations that provide family planning and AIDS-prevention services to minors.

**3.** Defendants argue that Plaintiffs have waived this claim because they failed to plead it, citing *Josey v. John R. Hollingsworth Corp.*, 996 F.2d

Pennsylvania Constitution entrusts to the legislature the responsibility for providing public education. Pa. Const. Art. III § 14. The General Assembly in turn has delegated power to the local school districts. *See* 24 Pa. Stat. Ann. § 2–201 *et seq.; Pennsylvania Fed'n of Teachers v. School Dist.*, 506 Pa. 196, 484 A.2d 751, 753 (1984). *See also* 53 Pa. Stat. Ann. § 13201 *et seq.* (authorizing first class cities, such as Philadelphia, to adopt charter provisions governing the administration of a home rule school district). Under this system, a local school district "is a creature or agency of the Legislature and has only the powers that are granted by statute, specifically or by necessary implication...." *Barth v. School Dist.*, 393 Pa. 557, 143 A.2d 909 (1958).

Although a school district's powers are limited to its statutory grant, this grant is a broad one. In the Public School Code of 1949, the Pennsylvania General Assembly granted local school districts the power to "establish, equip, furnish, and maintain [various schools and departments] for the education and recreation of persons residing in said district, and for the proper operation of its schools." 24 Pa. Stat. Ann. § 5–502. Local school districts have a duty to "define the general policies of the school system" and "to legislate upon all matters concerning the conduct of the schools subject to the provisions of this act." 24 Pa. Stat. Ann. § 21–2013. Both state law and the Philadelphia Home Rule Charter give schools all necessary powers to enable them to carry out the laws governing schools. 24 Pa.Stat.Ann. § 2–211; 351 Pa.Code § 12.12–300.[4]

In general, the state statute "reposes a wide discretion in the school board." *Harris v. Board of Pub. Ed. of School Dist. of Phila.*, 306 Pa. 546, 548, 160 A. 443 (1932) (construing related provision in 1911 School Code).

Under this broad grant of power, school districts have considerable control over school policies and activities. *See, e.g., Chambersburg Area School Dist. v. Pennsylvania*, 60 Pa.Commw. 29, 430 A.2d 740, 743 (1981) (upholding school district policy which banned smoking in all school district buildings, citing 24 Pa. Stat. Ann. § 2–211). Thus, these general provisions, standing alone, provide sufficient statutory authority for the condom program.

### 2. Cooperative Agreements

■ Plaintiffs maintain, however, that a school district's broad powers do not include the power to implement the condom program. They cite *Barth v. School Dist.*, 393 Pa. 557, 143 A.2d 909 (1958) as an example of a school district exceeding its statutory grant, and argue that the reasoning in *Barth* equally applies here. In *Barth*, the Pennsylvania Supreme Court concluded that the Philadelphia School District lacked authority to establish and fund, with the City of Philadelphia, a commission to address juvenile delinquency. While recognizing the program's laudable goals, the court found that "a worthy objective does not justify the action of a School District ... unless that action is authorized by the Constitution or by an Act of the Legislature." 143 A.2d at 911. The court could find no such statutory authorization in either 24 Pa. Stat. Ann. § 5–521 (permitting boards of school directors to enter into certain agreements with political subdivisions) or § 7–706 (authorizing school districts to join with local governments in equipping, maintaining, and operating parks, playgrounds, etc.). It further found that the expenditure of school district funds for this program, because the Public School Code did not specifically authorize it, was illegal under 24 Pa. Stat. Ann. § 6–610 ("The use or pay-

632 (3d Cir.1993), and *Agustin v. Quern*, 611 F.2d 206 (7th Cir.1979). Plaintiffs, however, did plead that Policy 123 "is illegal, exceeds the scope of the Board of Education's authority, and is otherwise contrary to state law per se and as implemented." (Complaint ¶ 7.)

4. The state law provides: "The several school districts in this Commonwealth shall be, and hereby are vested ... with all necessary powers

to enable them to carry out the provisions of this act." 24 Pa Cons.Stat. Ann. § 2–211. The Home Rule Charter similarly states: "To enable it to administer, manage, and operate the School District of Philadelphia, the Board of Education shall have the powers and duties enumerated herein and any other powers and duties, not inconsistent with law, which are necessary to carry into effect the powers and duties conferred upon it in this article." 351 Pa.Code § 12.12–300.

ment of any public school funds of any school district, in any manner or for any purpose not provided in this act, shall be illegal.").

After *Barth,* however, the law changed. The Philadelphia Home Rule Charter was amended expressly to authorize cooperative programs to address juvenile delinquency. 351 Pa.Code § 12.12–309(a). This same provision authorizes cooperative health programs: "The Board of Education shall have the authority to enter into agreements relating to, but not limited to, ... health services ... with any non-profit private agency when, in the opinion of the Board, such agreement will further the efficient and effective administration of public education." *Id.* The General Assembly specifically authorized such a provision in 53 Pa. Stat. Ann. § 13219.[5]

The Board of Education adopted Policy 123 "[p]ursuant to its authority under the Educational Supplement to the Home Rule Charter," Policy 123 ¶ 2.1, which includes the cooperative agreement provision, 351 Pa. Code. § 12.12–309. This policy "further[s] the efficient and effective administration of public education" § 12.12–309, by "reduc[ing] high risk sexual behavior leading to teen pregnancy, sexually transmitted diseases and HIV infection." Policy 123 ¶ 2.1.b. It is sadly self-evident that students' education is hindered when they drop out of school because they are pregnant, sick with venereal disease, or dying of AIDS. By "promot[ing] a healthy lifestyle for all children," Policy 123 ¶ 2.1, the Board of Education may better fulfill its educational mandate. Thus, the cooperative agreement provisions provide additional legislative authority for the condom program.

### 3. Health Services

▆▆▆ Plaintiffs argue, however, that the court instead should look at the statutory provision on school health services, 24 Pa. Stat. Ann. § 14–1402. Section 14–1402 enumerates required health services, which do not include condom distribution. 24 Pa. Stat. Ann. § 14–1402. Plaintiffs maintain that this provision shows a clear legislative intent to restrict, rather than expand, allowable school-based health services. They argue that, because the legislature did not explicitly authorize the distribution in the section of health services, the condom program is beyond the scope of the school district's authority.

I agree that condom distribution is within the implied definition of health services. In the Code, the Legislature adopts a broad meaning for health service, as indicated by the enumerated services, which include hearing and vision tests, tests for tuberculosis, and height and weight measurements. These services relate to the evaluation and preservation of students' health. Condoms, too, involve health preservation. While it requires very little training to use a condom in a medically correct way, neither does it require great medical expertise to measure a child's weight and height. Because a condom is a prophylactic measure to preserve health by reducing the risk of sexually transmitted disease, it is a health service within the meaning of the School Code.

I disagree, however, that the health services provision forbids condom distribution programs. The caption for the Code section relating to this statutory provision reads "*Required* health services." (emphasis added). While the legislature mandates the provision of certain health services, nothing in the statute forbids a school district from providing additional services, particularly where, as here, no school district funds are being spent.

5. Nothing in this act shall be construed as constituting a prohibition against agreements *including, but not limited to,* joint tax collection, joint purchasing of supplies, equipment and contractual services, use of recreational and park equipment and facilities, control and prevention of juvenile delinquency, city planning, capital budgeting, capital programming and comprehensive development planning, with any municipal or former county department agency, office, board or commission or

any agency of the Commonwealth or the United States Government, when, in the opinion of a duly constituted board of education of the home rule school district or its authorized agents, such agreement will further the efficient and effective administration of public education.
53 Pa. Stat. Ann. § 13219 (emphasis supplied).
 The non-exclusive language of this section permits the Board of Education to expand cooperative agreements into the realm of health services.

During oral argument, Plaintiffs linked their health services argument with their argument on cooperative agreements. Specifically, they contended that 351 Pa.Code § 12.12–309 authorizes cooperative agreements only to provide those health services otherwise mandated by law, namely, those listed in § 14–1402. This argument fails. The statutes and regulations regarding mandatory health services already prescribe the means by which the schools must deliver those services. *See. e.g.,* 24 Pa. Cons.Stat. Ann. § 14–1401 (defining school health personnel); § 14–1410 (governing "[e]mployment of school health personnel"); § 14–1411 (governing public contracts for health services with local health departments); 28 Pa. Code §§ 23.32(b), 23.33(b), 23.34, 23.35(b) (governing employment of school health personnel). Section 12.12–309, in contrast, broadly authorizes cooperative agreements "relating to ... health services" whenever a school board determines that such agreements would enhance the effective administration of public education. This provision cannot apply to the mandated health services because these must be delivered through direct hiring and public contracts as specified by law. To have meaning, § 12.12–309 must apply instead to other health-related services, such as the condom program, which are not mandated but which school districts have the discretion to offer. Further, as discussed below, the school district could distribute condoms in schools not as a health service to students, but as an effective means of fulfilling its educational mandate by targeting those students most at risk.

### 4. Health and Hygiene Education

■ The School District's authority to implement Policy 123 also may be found in its authority to educate students about health and hygiene. A school district must instruct its students in physiology and hygiene, and include in this instruction "special reference to tuberculosis and its prevention." 24 Pa. Stat. Ann. § 15–1513.[6] In other words, the legislature intended that school districts

teach their students ways to promote health and prevent the transmission of communicable diseases.

The State Board of Education echoes these concerns about health in its regulations promulgated under the authority granted by the School Code. The State Board's construction of state law, as manifested in these regulations, deserves deference. *Cf. Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984) (courts should accord considerable weight to federal agencies' construction of federal statutes that they administer). In these regulations, the State Board mandates that "[e]ach student shall acquire and use the knowledge and skills necessary to promote individual and family health and wellness." 22 Pa.Code. § 5.201(e)(8). Students should "demonstrate their knowledge of the benefits associated with physical fitness and good personal health habits including health promotion and disease prevention." 22 Pa.Code. § 5.202(f)(8)(iii). Thus, high schools must teach "[w]ellness and fitness, incorporating physical education, aerobic fitness, regular physical activity and health and instruction every year about prevention of alcohol, chemical and tobacco abuse." 22 Pa.Code. § 5.213(c)(9).

In addition, school districts must give "instruction regarding [the] prevention of human immunodeficiency virus (HIV) infection/acquired immunodeficiency syndrome (AIDS)." 22 Pa.Code. § 5.220(a). Specifically,

> Educational materials and instruction shall be determined by the Local school district and be appropriate to the age group to be taught. The program of instruction shall include information about the nature of the disease, the lack of a cure, the ways the disease is transmitted and how the infection can be prevented. The school district may omit instruction in the elementary grades on the transmission of the disease through sexual activity. Programs discussing transmission through sexual activi-

---

6. This statutory language had its genesis in the Act of 1911 back when the potential for contraction of that dread disease filled one's heart with fear. *See* 1911 Pa. Laws 309 § 1609. Medical

progress and changing times have brought about some difference in what infectious killers are of preeminent concern, but the statutory purpose, protection of the children, remains constant.

ty shall stress that abstinence from sexual activity is the only completely reliable means of preventing sexual transmission. Programs shall stress that avoidance of illegal drug use is the only completely reliable means of preventing transmission through shared drug paraphernalia.

22 Pa.Code. § 5.220(b). Parents who do not wish their children to receive this education may request in writing that the school excuse their children from these classes. 22 Pa. Code. § 5.220(c).

In light of these regulations, the Philadelphia Board of Education rationally could decide that permitting students conditional access to condoms in schools furthers its health education goals. Curricula developed under Policy 123 teach students about HIV and its consequences, among other things. Stressing abstinence, these curricula wisely include instruction in another form of prevention, namely the use of a prophylactic. Following this instruction, if not before, students will know that condoms can help prevent the spread of HIV and other sexually transmitted diseases. The School District knows that these students may obtain condoms from a variety of sources, including pharmacies, clinics, and even in certain rest rooms. In-school access to condoms does not give the students significantly greater ability to obtain condoms than they would have without the program.[7] It does, however, come at a price that furthers the School District's educational mission: students who obtain condoms in the school must receive a lecture on

abstinence, and learn how to use condoms properly.[8] The condom distribution program gives the School District another opportunity to urge students not to engage in sexual activity. The program also thus targets those students most at risk of contracting a social disease, i.e., those who intend to engage in sexual relations. The School District thus ensures that the students know how to use condoms correctly. The student who buys condoms from a drug store does not necessarily receive this instruction; the one who gets them through the in-school program does. Thus, the program promotes the education of school students in physiology and hygiene, as authorized and required by the School Code.[9]

In sum, I find that the School District has the requisite statutory and codal authority to implement the condom program.

### 5. Abuse of Discretion

 The next question is whether the Board of Education abused its discretionary authority when it enacted Policy 123. As a general rule, courts should not interfere with the discretionary exercise of a school board's power unless the board's action was based upon (1) a "misconception of law" which caused the school board to act outside its statutory authority, (2) "ignorance through lack of inquiry into the facts necessary to form an intelligent judgment," or (3) "arbitrary will or caprice." *Roberts v. Board of Directors of the School Dist.*, 462 Pa. 464, 341 A.2d 475, 480 n. 4 (1975). *See also Zebra v.*

---

**7.** In fact, the in-school program gives students less opportunity to obtain condoms than they would have elsewhere because their parents may prevent them from participating in it.

**8.** I acknowledge that at least one court has found that "[s]upplying condoms to students upon request has absolutely nothing to do with education, but rather is a health service occurring after the educational phase has ceased." *Alfonso v. Fernandez*, 195 A.D.2d 46, 606 N.Y.S.2d 259, 263 (1993). I respectfully disagree with the court's conclusion that a condom program has no educational component. I note additionally that the court there had to decide whether an in-school condom distribution program constitutes a health service because it determined that the common law of New York requires third persons to obtain parental consent before providing health services to minors. That court rejected

the defendants' argument that the program was more health education than a health service. Because, as I shall discuss below, minors in Pennsylvania do not require parental consent to receive condoms, I need not so strictly differentiate between health education and health services.

**9.** This program thus differs markedly from the program struck down in *Barth*. There, the School District, in conjunction with the city, attempted to combat juvenile delinquency in an apparent exercise of a police power it lacked. Although the program might well have had beneficial effects on education, it did not itself include an educational component. Here, by contrast, the condom program furthers the school district's ability to fulfill its legislatively mandated role as an educator.

School Dist., 449 Pa. 432, 296 A.2d 748, 750 (1972); *Spann v. Joint Boards of School Directors,* 381 Pa. 338, 113 A.2d 281, 286 (1955). Thus, for example, the Pennsylvania Supreme Court upheld a school regulation to require students to be vaccinated in order to attend public schools. *Duffield v. School Dist.,* 162 Pa. 476, 29 A. 742, 743 (1894) ("It is not an error in judgment, or a mistake upon some abstruse question of medical science, but an abuse of discretionary [10] power, that justifies the courts in interfering with the conduct of the school board...."). As discussed above, the Board of Education acted within its statutory authority. Nor is there evidence that the Board acted out of either ignorance or caprice. To the contrary, the Board of Education held multiple hearings and conducted a thorough examination of the reasons for, and implications of, distributing condoms in public schools. Thus, Plaintiffs' claim, that the board exceeded or abused the bounds of its legal authority, fails.

### B. *Pennsylvania Law on Parental Consent*

#### 1. Common Law

Plaintiffs also argue that the condom program is illegal under the common law and under Pennsylvania statutes governing parental consent. Under the common law, parental consent must be secured before medical treatment can be provided to minors. *See, e.g., Parents United for Better Schools, Inc. v. School Dist.,* 166 Pa.Commw. 462, 646 A.2d 689, 691 (1994) (describing the parental consent requirement for medical treatment as a "time honored" principle, without deciding whether condom distribution is a medical service). The parental consent requirement, however, is far from absolute. Parental consent may be waived when the parent's refusal of consent likely would compromise the minor's long-term prospects for health and well-being, *In re Cabrera,* 381 Pa.Super. 100, 552 A.2d 1114 (1989), or when the minor is mature enough to speak for himself, *In re Green,* 448 Pa. 338, 292 A.2d 387 (1972).

The scope of the common-law parental consent rule may be defined by reference to the informed consent doctrine. Under Pennsylvania common law, unless there is an emergency, physicians must obtain their patients' informed consent to surgical procedures. *See Moure v. Raeuchle,* 529 Pa. 394, 404, 604 A.2d 1003, 1008 (1992).[11] Failure to obtain this consent renders the subsequent operation a battery. *See id.* This requirement, however, extends only to procedures in which physicians or their agents intends use of their medical expertise to physically contact the patient, either directly or by wielding medical instruments. *See Boyer v. Smith,* 345 Pa.Super. 66, 72, 497 A.2d 646, 649 (1985) ("We are of the opinion that the doctrine of informed consent should continue to be limited in its applicability to only those cases involving surgical or operative medical procedures"). Thus, the doctrine does not extend, for example, to the "administration of therapeutic drugs." *Id.* On the other hand, it does encompass needle injections. *See Karibjanian v. Thomas Jefferson Univ. Hosp.,* 717 F.Supp. 1081, 1084 (E.D.Pa.1989). One of the cases upon which the plaintiffs rely, *Zaman v. Schultz,* 19 Pa. D. & C. 309 (Com.Pl.1933), follows this general rule. There, the court treated as an operation the extraction of blood for a transfusion. *See id.* at 312. The procedure undeniably involved a touching by someone with medical background. Here, by contrast, the persons dispensing the condoms may have no medical training, perform no surgical procedures on the students, and intend no contact with them. Thus, they no more need parents' consent to dispense condoms to a student than a pharmacist would need that con-

---

**10.** The test for abuse of discretion is a high procedural hurdle in Pennsylvania:

> abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence or the record, discretion is abused.

*Man O'War Racing Ass'n v. State Horse Racing Comm'n,* 433 Pa. 432, 250 A.2d 172, 181 n. 10 (1969) (citing *Mielcuszny v. Rosol,* 317 Pa. 91, 94, 176 A. 236, 237 (1934)).

**11.** If a physician intends to operate on a minor, he first must obtain the minor's parents' consent. *See Marino v. Ballestas,* 749 F.2d 162, 167 (3d Cir.1984).

sent to sell the minor students condoms in a drug store.[12] *See also Alfonso v. Fernandez,* 195 A.D.2d 46, 606 N.Y.S.2d 259, 270 (1993) (Eiber, J., dissenting) ("it is anomalous to construe the phrase 'health services' as a means of restricting the rights of minors of high school age to voluntarily request condoms, which minors in this State are permitted to purchase or obtain from a variety of other sources").

More generally, medical treatment tends to come after the fact. If one puts on suntan lotion before partaking of the beach, that is not medical treatment, but rather prevention. There is at that time no malady to treat—only the recognition that prolonged exposure to the sun's strong ultraviolet rays can create sundry skin problems. On the other hand, if one frolics at length on the beach, basking, unprotected, in the sun's bright rays, the later rendezvous with the doctor to seek a remedy for the blistered sunburn—or the onset of skin cancer—can fairly be described as medical treatment. The former is preventative, or prophylactic, while the latter is curative treatment for a medical malady that had not been prevented. Condoms, like suntan lotion, are prophylactic. Condoms are non-invasive, are not used to diagnose or cure disease, and do not require medical training or supervision for their use. Because condom distribution is not a medical treatment, it would not fall within the common-law rule.

Plaintiffs, however, would expand the common-law rule beyond curative procedures involving physical contact by arguing that health services, such as condom distribution, also require parental consent. I agree that condom distribution is health-related. Whether condoms are used can have a significant impact upon a person's health.[13] When used properly, condoms serve as a barrier for germs, bacteria and viruses, thus keeping contagious little disease generators from passing from one person's body into another's, thereby infecting, perhaps fatally, the other person. Not all condoms are totally impermeable, and thus, they are not all perfect. But they do reduce the risk of infection with sexually transmitted diseases. Because condom usage may help to preserve health, their distribution is a health service, within the ordinary meaning of that term. Impact upon health, however, does not transform a health service into a medical treatment. Health services, by definition, encompass far more than medical treatment. Because the cases requiring parental consent speak only to medical treatment, I will not engraft a common-law consent requirement onto the much broader category of health services.

Finally, I find that the plaintiffs' reliance on *Guerrieri v. Tyson,* 147 Pa.Super. 239, 24 A.2d 468 (1942) is misplaced. *Guerrieri* stands for the sound and unremarkable proposition that *in loco parentis* authority does not give a public school teacher the "authority to exercise her lay judgment, as a parent may, in the matter of treatment of injury or disease suffered by a pupil." *Id.,* 24 A.2d at 469. The case involves a teacher's well-meaning, but misguided, personally administered treatment of her student's injured hand, treatment that caused permanent disfigurement. Clearly, the school teacher in that situation could not have relied on the legislature's and the State Board's grant of educational authority to the local school district. Here, however, as discussed above, the School District instituted Policy 123 as part of its mandate to educate its students in matters of health. *See* 24 Pa. Stat. Ann. § 15–1513; 22 Pa.Code § 5.220. Because the

---

12. The common law of Pennsylvania does not require parental consent for all agreements between minors and third parties. For example, although minors generally have no "competence" to contract, they may, without parental consent, enter into contracts with others. The law protects minors by permitting them to void contracts, other than contracts for necessities, "at any point up until a reasonable time after the minor attains his or her majority." *Aetna Cas. & Sur. Co. v. Duncan,* 972 F.2d 523, 526 (3d Cir. 1992).

13. Health means "1 a: the condition of an organism or one of its parts in which it performs its vital functions normally or properly . . . b: the condition of an organism with respect to the performance of its vital functions esp. as evaluated subjectively or nonprofessionally. . . ." *Webster's Third New Int'l Dictionary, Unabridged* 1043 (1986).

School District's authority to implement the condom program stems from its educational mandate, not its *in loco parentis* authority, *Guerrieri* is inapposite.

### 2. Minors' Consent Act

■ Plaintiffs also cite the Minors' Consent Act, 35 Pa. Stat. Ann. §§ 10101–10105, as prohibiting condom distribution without parental consent. This Act enables minors, under certain circumstances, to consent on their own to "medical, dental and health services." Although the statute itself does not define what it means by "health service," I have found that condom distribution is a health service in the ordinary meaning of that term. Plaintiffs argue that, because condom distribution is not an enumerated exception within the Act, parental consent is required. Defendants and Intervenors, however, muster several convincing arguments to the contrary.

■ Notably, a provision of the Act permits minors to consent to "medical and health services to determine the presence of or to treat pregnancy, and venereal disease . . . and the consent of no other person shall be necessary." 35 Pa. Stat. Ann. § 10103. On the one hand, the Legislature easily could have inserted "to prevent" before "to determine." On the other hand, it seems absurd for the legislature to allow minors to consent to treatment once they are pregnant or infected with a sexually transmitted disease, but forbid them to obtain contraceptives to prevent those conditions without parental consent. Such an absurd result is to be avoided. *See, e.g., McConnaughey v. Building Components, Inc.*, 536 Pa. 95, 637 A.2d 1331, 1334 n. 4 (1994) ("When construing statutes under Pennsylvania law, it is assumed that the legislature does not intend a result which is absurd or unreasonable."). Nor should Pennsylvania law be interpreted to contradict federal or constitutional law. U.S. Const. art. VI, cl. 2; 1 Pa. Cons.Stat. Ann. § 1922(3) (providing that, in ascertaining statutory intent, courts should presume that the General Assembly does not intend to violate federal or state constitutions). As discussed below, both federal and constitutional law bar the imposition of a blanket prior-parental-consent requirement for distribution of contraceptives to minors.

Further, the very terms of the statute express an intent to liberalize the circumstances under which minors can receive medical care. This liberalization finds expression in the statute's title: "An Act *[e]nabling* certain minors to consent to medical, dental and health services." 1970 Pa. Laws Act No. 10 (emphasis added). If, by negative implication, the statute disables minors from providing consent in any circumstances not enumerated, it would restrict the very rights it means to expand. *See T.H. v. Jones*, 425 F.Supp. 873, 881 n. 5 (D.Utah 1975) (rejecting argument that state law granting minors right to consent to treatment for venereal disease implicitly disabled them from consenting to contraceptive services), *aff'd on statutory grounds*, 425 U.S. 986, 96 S.Ct. 2195, 48 L.Ed.2d 811 (1976). Significantly, the Pennsylvania Supreme Court has not viewed the Act as a barrier to the development of exceptions to minors' general incapacity to consent to health care: *In re Green*, which recognizes an exception for mature minors under age 18, was decided after the statute's enactment. Thus, an exception to the parental consent requirement for health services, even though not specified in the Minor's Consent Act, may be inferred in the context of contraception.

### C. Minors' Federal Statutory Rights

■ The intervenors correctly maintain that the federal statutory rights of minors preclude the imposition of a parental consent requirement. Four of the nine school health resource centers, in which condoms are distributed, are funded, in part, through grants under Title X of the Public Health Service Act, 42 U.S.C. § 300(a). Congress enacted Title X in order to provide comprehensive family planning services to all who sought them, including adolescents. *Planned Parenthood Fed'n of America v. Heckler*, 712 F.2d 650, 651–52 (D.C.Cir.1983). Title X services include the provision of contraceptives. *Id.* Although the statute encourages family involvement, it stresses confidentiality. *Id.* at 659–60. Thus, all circuit courts which have considered the issue have concluded

that parental consent cannot be required before a minor receives Title X services. *See County of St. Charles, Mo. v. Missouri Family Health Council,* 107 F.3d 682, 684–85 (8th Cir.1997) (citing cases). If Pennsylvania's Minor's Consent Act requires parental consent before providing contraceptives, it must yield to federal confidentiality requirements whenever a minor seeks contraceptives through a Title X program.[14]

### D. *Minors' Privacy Rights*

█ Students' privacy rights also prohibit the imposition of a state statutory or common-law prior-parental consent requirement for condom distribution. The Supreme Court has reaffirmed repeatedly that, although the state has "somewhat broader authority to regulate the activities of children than of adults," *Planned Parenthood v. Danforth,* 428 U.S. 52, 74, 96 S.Ct. 2831, 2843, 49 L.Ed.2d 788 (1976), minors are entitled to federal constitutional protection in making decisions about reproductive health care. *See. e.g., Carey v. Population Servs. Int'l,* 431 U.S. 678, 693, 97 S.Ct. 2010, 2020, 52 L.Ed.2d 675 (1977) (plurality) ("the right to privacy in connection with decisions affecting procreation extends to minors as well as to adults."); *Danforth,* 428 U.S. at 74, 96 S.Ct. at 2843 ("Minors, as well as adults, are protected by the Constitution and possess constitutional rights."). Constitutional protection for minors is critical because pregnancy and sexually transmitted diseases impact as heavily, if not more heavily, upon minors. *See T.H. v. Jones,* 425 F.Supp. 873, 881 (D.Utah 1975), *aff'd on statutory grounds,* 425 U.S. 986, 96 S.Ct. 2195, 48 L.Ed.2d 811 (1976) ("The interest of minors in access to contraceptives is one of fundamental impor-

tance. The financial, psychological and social problems arising from teenage pregnancy and motherhood argue for our recognition of the right of minors to privacy as being equal to that of adults.").

During the past two decades, the Supreme Court consistently has rejected blanket parental-consent requirements for abortions, holding instead that minors must have recourse to the courts if they will not or cannot obtain their parents' consent. *See, e.g., Planned Parenthood v. Casey,* 505 U.S. 833, 899, 112 S.Ct. 2791, 2832, 120 L.Ed.2d 674 (1992); *Hodgson v. Minnesota,* 497 U.S. 417, 461, 110 S.Ct. 2926, 2950–51, 111 L.Ed.2d 344 (1990) (O'Connor, J., concurring); *Bellotti v. Baird,* 443 U.S. 622, 643–44, 99 S.Ct. 3035, 3048–49, 61 L.Ed.2d 797 (1979).[15] Access to contraceptives may be just as important as access to abortions: "the-decision whether to use contraceptives is as intimate and personal as, and involves risks to the individual which are comparable to those raised by the decision whether to have an abortion." *Planned Parenthood Ass'n v. Matheson,* 582 F.Supp. 1001, 1009 (D.Utah 1983). But states have even less interest in regulating minors' access to contraception than in regulating minors' access to abortion. *See Carey,* 431 U.S. at 694, 97 S.Ct. at 2021 (plurality) ("The State's interest in protection of the mental and physical health of the pregnant minor, and in protection of potential life are clearly more implicated by the abortion decision than by the decision to use a nonhazardous contraceptive."). Thus, the Constitution forecloses an interpretation of Pennsylvania law that would compel parental consent whenever a minor seeks contraceptives. *See Carey,* 431 U.S. at 694, 97 S.Ct. at 2021 (plurality) ("Since the State may not impose

---

14. Intervenors also note that Medicaid recipients, including minors, have a statutory right to receive confidential family planning services. 42 U.S.C. § 1396d(a)(4)(C) ("The term 'medical assistance' means payment of part or all of the cost of the following care and services ... family planning services and supplies furnished ... to individuals of child-bearing age (including minors who can be considered to be sexually active)...."). *See also* 42 C.F.R. §§ 431.301, 431.305(b), 440.240(b), 440.250(c) (1996) (requiring family planning services for sexually active minors on an equal basis with adults, and protecting patient confidentiality). However, be-

cause the condom program at issue here does not use Medicaid funding, these statutory and regulatory provisions do not apply.

15. Intervenors aptly point out that while the Supreme Court of the United States has *permitted* states to mandate parental involvement in a minor's abortion decision, provided that the minor retains a constitutionally adequate alternative such as a judicial bypass procedure, the Court has never held that the government is *compelled* to involve parents.

a blanket prohibition, or even a blanket requirement of parental consent, on the choice of a minor to terminate her pregnancy, the constitutionality of a blanket prohibition of the distribution of contraceptives to minors is a fortiori foreclosed."). *See also Matheson*, 582 F.Supp. at 1009 ("the state may not impose a blanket parental notification requirement on minors seeking to exercise their constitutionally protected right to decide whether to bear or to beget a child by using contraceptives.").

Plaintiffs counter that requiring prior parental consent for in-school distribution of condoms would not implicate minors' constitutional rights because students could obtain condoms outside of school. Plaintiffs do not explain, however, why consent could be required in the schools but not beyond the schoolhouse door. If the condom program is invalidated for violation of the Minor's Consent Act or a common-law parental consent rule, then individuals and organizations outside the school district also would be required to obtain consent. Such a rule would heavily burden minors' privacy rights by severely limiting their access to condoms:

> if the distribution of condoms is a 'health service' which cannot be undertaken without parental consent, then the many family planning clinics throughout this State which distribute condoms ... must also be deemed in violation of the common law and statute. . . . [T]o preclude distribution of condoms to minors without parental consent would have a significant impact upon the ability of minors to obtain condoms, and thus violate their constitutionally-recognized right to make such decisions privately.

*Alfonso v. Fernandez*, 195 A.D.2d 46, 606 N.Y.S.2d 259, 271 (1993) (Eiber, J., dissenting). Thus, given both federal statutory and constitutional mandates, I cannot adopt the plaintiffs' interpretation of state law.

### E. Constitutionality of the Condom Program

The other constitutional issue raised by the parties is whether the condom program unconstitutionally infringes upon parents' Fourteenth Amendment liberty interests. The Supreme Court long has recognized that parents have the right to be free from unnecessary governmental intrusion in the rearing of their children. *See, e.g., Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S.Ct. 1526, 1541, 32 L.Ed.2d 15 (1972) (finding that the "primary role of parents in the upbringing of their children is now established beyond debate"); *Farrington v. Tokushige*, 273 U.S. 284, 298, 47 S.Ct. 406, 409, 71 L.Ed. 646 (1927) (noting that the parental "right to direct the education of his own child without unreasonable restrictions"); *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925) (emphasizing parents' right "to direct the upbringing and education of children under their control."); *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626–27, 67 L.Ed. 1042 (1923) (stating that the Fourteenth Amendment protects "the right of the individual to ... bring up children ... according to the dictates of his own conscience. . . ."). State programs or statutes can infringe upon this interest when they are inherently coercive, that is, when the state either requires or prohibits some secular activity.[16] *See, e.g., Yoder*, 406 U.S. at 234–35, 92 S.Ct. at 1542–

---

**16.** To support their constitutional argument on parental rights, Plaintiffs cite several Establishment clause cases. When a public school engages in or promotes practices which involve religion, students and parents need not show coercion to prevail in an Establishment Clause challenge. *See, e.g.,; School Dist. v. Schempp*, 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963) (holding that Establishment Clause claim need not be "predicated on coercion"); *Engel v. Vitale*, 370 U.S. 421, 430, 82 S.Ct. 1261, 1266–67, 8 L.Ed.2d 601 (1962) (noting that Establishment Clause violation "does not depend upon any showing of direct governmen-

tal compulsion"). The underlying rationale for these cases is that the Establishment Clause is premised on the belief that "a union of government and religion tends to destroy government and degrade religion." *Engel*, 370 U.S. at 431, 82 S.Ct. at 1267. Thus, "it is not enough that the government restrain from compelling religious practices: It must not engage in them either." *Lee v. Weisman*, 505 U.S. 577, 604, 112 S.Ct. 2649, 2664, 120 L.Ed.2d 467 (1992) (Blackmun, J., concurring). Given this reasoning, the Establishment Clause cases cited by Plaintiffs are inapposite to this action involving a school district's secular activity.

43 (concluding that First and Fourteenth Amendments prevent state from compelling Amish parents to send their children to school until age 16); *Farrington,* 273 U.S. at 298–99, 47 S.Ct. at 408–09 (striking down a Hawaiian statute which effectively would have eliminated foreign language schools); *Pierce,* 268 U.S. at 534–36, 45 S.Ct. at 573–74 (affirming that states may not compel parents to send their children to public, as distinct from private or parochial, schools); *Meyer,* 262 U.S. at 403, 43 S.Ct. at 628 (striking down a Nebraska statute that forbade the teaching of any language other than English before the eighth grade).

During oral argument, Plaintiffs urged that the parental opt-out scheme is coercive upon parents in that it forces them to respond. Coercion is a strong word. It conjures visions of being compelled to confess to crime while being stretched upon the rack, or being subjected to the persuasive revolutions of a thumbscrew. The American Heritage Dictionary, Third Edition, defines "coerce" as "to force to act . . . in a certain way by use of pressure, threats, or intimidation; compel . . . [t]o dominate, restrain or control forcibly . . . [t]o bring about by force or threat." *American Heritage Dictionary* 367 (3d ed.1992). The New Shorter Old English Dictionary defines "coerce" as to "(f)orcibly constrain or impel (*into* obedience, compliance, etc.); force or compel *to do.*" *The New Shorter Old English Dictionary* 433 (1993).

It is true that the way the rules are written, if a Philadelphia school parent does not write back with a naysay, the condom program may proceed as to that child. But that is more analogous to the "coercion" visited upon a customer by a book club, where the rules are that failure timely to decline the offered book results in book—and bill—arriving by the end of the month. That concededly does place some impetus upon the customer to respond, but to characterize that postal-R.S.V.P. situation as "coercive," would be to stretch the term beyond its true meaning. There is a difference between pesky annoyance and forcible coercion. So also is that the case at bar. Coercion this is not.

There are a number of contexts within which parents must be in communication with their children's schools. Should they want their children excused from class for an appointment, they must tell the teacher or send a note. Should they want their children exempted from HIV/AIDS instruction, they must make the request in writing. 22 Pa. Code § 5.220(c). If, on religious grounds, they want their children exempted from particular instruction, they must make the request in writing. 22 Pa.Code § 5.4(d)(3). They also must make a written request to have their children excused from state assessments. 22 Pa.Code § 5.4(d)(4). Similarly, if they object to required immunizations, they must put their objections in writing. 28 Pa.Code § 23.84(b). Such requirements do not rise to the level of coercion.

So also, just as the condom program at issue here is not coercive upon the parents, nor is it coercive upon the students. Students may be compelled to attend school, but they are not compelled to participate in the condom program. Student use of the health resource centers is entirely voluntary. Further, parents are free to instruct their children not to use the program, and may even actively prevent their children's participation by sending an opt-out letter to the school. In fact, the opt-out provision encourages parental involvement by notifying them of the school program and permitting them to forbid their children to use it. Because it allows parents to restrict children's in-school access to condoms, the provision gives parents more authority and control over their children. The opt-out provision supports, not burdens, parental rights. Parents thus "remain free to exercise their traditional care, custody and control over their unemancipated children." *Doe v. Irwin,* 615 F.2d 1162, 1168 (6th Cir.), *cert. denied,* 449 U.S. 829, 101 S.Ct. 95, 66 L.Ed.2d 33 (1980) (rejecting substantive-due-process challenge to publicly operated family planning center which gave contraceptives to minors upon request without parental notification or consent). *See also Curtis v. School Comm.,* 420 Mass. 749, 652 N.E.2d 580, 587 (1995) (upholding condom distribution program without any parental notification or consent requirements), *cert. denied,* —— U.S. ——, 116 S.Ct. 753, 133 L.Ed.2d 700 (1996); *Alfonso v. Fernandez,* 195 A.D.2d 46, 606

N.Y.S.2d 259, 265–67 (1993) (striking down condom distribution program which lacked parental consent requirement, but noting that such a program would be constitutionally valid if it had a parental "opt-out" procedure).

Because I find that Plaintiffs have not shown that the state has violated their constitutional rights, it is unnecessary to consider whether the state has a compelling interest which supersedes the parents' liberty interest. *See. e.g., Prince v. Massachusetts,* 321 U.S. 158, 165–69, 64 S.Ct. 438, 441–44, 88 L.Ed. 645 (1944).

### F. *Private Cause of Action under Criminal Statutes*

■ The intervenors also request that the court grant them summary judgment on Plaintiffs' claim for child endangerment (Count III). They maintain that Plaintiffs have waived this count by failing to argue it in their Response, and that, if not waived, this count must fail because Plaintiffs have no private right of action under 18 Pa. Cons. Stat. § 4304(a), the criminal statute prohibiting child endangerment.[17] Because I find that Plaintiffs cannot prove their claim in Count III, I find it unnecessary to reach the question of whether this statute permits a private cause of action.

As a preliminary matter, I shall not deem this count abandoned simply because Plaintiffs have not defended it in their Response. Although a court is permitted to enter judgment when the non-movant fails to respond, *see* Fed.R.Civ.P. 56(e), the court is not automatically required so to do. *See, e.g., John v. Louisiana (Bd. of Trustees for State Colleges & Univs.),* 757 F.2d 698, 709–10 (5th Cir. 1985).

Count III alleges that the defendants' distribution of condoms in public schools endangers the welfare of children because they thus increase children's sexual activity which is harmful to their physical, psychological and spiritual well-being. Under Pennsylvania law, "[a] parent, guardian, or other person supervising the welfare of a child under 18 years of age ... [breaks the law] if he knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa. Cons.Stat. § 4304(a). This statute is to be "given meaning by reference to the 'common sense of the community' and the broad protective purpose for which ... [it was] enacted." *Commonwealth v. Mack,* 467 Pa. 613, 359 A.2d 770, 772 (1976). To be held liable, the alleged offender must be "aware of his or her duty to protect the child; is aware that the child is in circumstances which threaten the child's physical or psychological welfare; and has either failed to act or has taken actions so lame or meager that such actions cannot reasonably be expected to be effective to protect the child's ... welfare." *Commonwealth v. Cardwell,* 357 Pa.Super. 38, 515 A.2d 311, 315 (1986), *appeal denied,* 515 Pa. 573, 527 A.2d 535 (1987). Plaintiffs, however, cannot show either that the condom program endangers children or that the defendants had the requisite intent. If in-school distribution of condoms increases sexual activity, Plaintiffs might show endangerment. But Plaintiffs have provided no evidence linking condom distribution to increased sexual activity. Further, while improper use of condoms can be dangerous, failing to use condoms puts sexually active children at even greater risk. If anything, the danger to the children would be increased were this condom program quashed.[18] Thus, Plaintiffs have not shown that the condom program endangers children. Without a showing of endangerment, there can be no liability.

Even if Plaintiffs could show that the condom program endangers children, they cannot prove that the defendants had the requisite intent. Rather, the record evidences the

---

**17.** Their motion also requests summary judgment on Counts IV (Endangering Welfare of Children) and VII (Corruption of Morals of Minors). I find it unnecessary to address these counts, however, because Plaintiffs already have abandoned them. (Pls.' Resp. at 33 n. 2.)

**18.** In this regard, at oral argument, Plaintiff's counsel suggested that perhaps the panacea would simply be to order the adolescent school children of Philadelphia to just say no. I allowed as to how that would involve this court in a saga uncomfortably reminiscent of that of King Canute, impotently commanding the waves to be still.

defendants' belief that the program promotes students' health and welfare, not that it endangers them. The mere possibility, unsupported by this record, that Defendants might be mistaken in their belief, as Plaintiffs argue, cannot support a claim for child endangerment. *See Commonwealth v. Miller,* 411 Pa.Super. 33, 600 A.2d 988, 992 (1992) (concluding that mistakes in judgment which harm children do not rise to the level of criminal culpability unless parents knowingly allow their children to be at risk with awareness of the potential consequences of their actions). Thus, I shall grant summary judgment to the defendants and intervenors on this claim as well.

## IV. *Conclusion*

I thus hold that there is no genuine issue of material fact and conclude that the applicable law commands that judgment be summarily entered in favor of the Defendants and against the Plaintiffs.

An order follows.

### *ORDER*

AND NOW, this 11th day of September, 1997, upon the reasoning in the attached Memorandum:

1. Defendants' Motion for Summary Judgment is GRANTED. Judgment is entered in favor of Defendants and against Plaintiffs.

2. Intervenor-Defendants' Motion for Summary Judgment is GRANTED. Judgment is entered in favor of Intervenor–Defendants and against Plaintiffs.