

Opinions of the United
States Court of Appeals
for the Third Circuit

7-9-1998

# Parents United v. Sch Dist Phila

Precedential or Non-Precedential:

Docket 97-1829

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Parents United v. Sch Dist Phila" (1998). *1998 Decisions*. Paper 151.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/151

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 9, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-1829

PARENTS UNITED FOR BETTER SCHOOLS, INC.;
CLIFTON WELDON, parent and natural guardian of
LAKEYA WELDON; ALICIA BUCKSON, parent and natural
guardian of DAMON HARRIS; LORNA WILLIAMS, natural
guardian of TOUREE JOHNSON; ROBIN PIERCE, parent
and natural guardian of DANA WELKS; ANTHONY SCOTT,
parent and natural guardian of NITIKIA SCOTT; HAROLD
STEPHENS, parent and natural guardian of MELISSA D.
STEPHENS; PHILIP BATTAGLIA, parent and natural
guardian of PHIL BATTAGLIA

v.

SCHOOL DISTRICT OF PHILADELPHIA BOARD OF
EDUCATION; RUTH HAYRE, DR., President, School
District of Philadelphia Board of Education; CONSTANCE
E. CLAYTON, DR., Superintendent of Schools of the
School District of Philadelphia; JAMIL DOE, a minor, by
his parents and guardians SARAH DOE and WILLIAM
DOE; SARAH DOE; WILLIAM DOE; LATIYA SMITH, a
minor, by her guardian RUTH LOWE; ROSETTA DAVIS, a
minor, by her guardian BARBARA ZLOTOWSKI; ADRIAN
JONES, a minor, by her guardian GAIL SOSNOV;
NATASHA BROWN, a minor, by her mother and guardian
VENITA BRACY; JOAN ADLER, M.D.; ACTIONAIDS INC;
FAMILY PLANNING COUNCIL OF SOUTHEASTERN
PENNSYLVANIA, INC.; PLANNED PARENTHOOD OF
SOUTHEASTERN PENNSYLVANIA

          Parents United For Better
          Schools, Inc.; Clifton Weldon;
          Alicia Buckson; Lorna Williams;
          Robin Pierce; Anthony Scott;
          Harold Stephens; Philip
          Battaglia,
          Appellants

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 96-cv-03791)

Argued May 7, 1998

Before: SCIRICA, COWEN and BRIGHT,*
Circuit Judges

(Filed July 9, 1998)

DENNIS M. ABRAMS, ESQUIRE
  (ARGUED)
Lowenthal & Abrams
555 City Line Avenue, Suite 440
Bala Cynwyd, Pennsylvania 19004

 Attorney for Appellants

GLENNA M. HAZELTINE, ESQUIRE
  (ARGUED)
School District of Philadelphia
Office of General Counsel
2130 Arch Street, 5th Floor
Philadelphia, Pennsylvania 19103
_____

*The Honorable Myron H. Bright, United States Circuit Judge for the
Eighth Judicial Circuit, sitting by designation.

Attorney for Appellees,
School District of Philadelphia; Dr.
Ruth W. Hayre, President, School
District of Philadelphia Board of
Education; Dr. Constance E.
Clayton, Superintendent of Schools
of the School District of
Philadelphia

CATHERINE WEISS, ESQUIRE
 (ARGUED)
LISA LANDAU, ESQUIRE
JENNIFER DALVEN, ESQUIRE
American Civil Liberties Union
 Foundation
Reproductive Freedom Project
125 Broad Street, 18th Floor
New York, New York 10004

DEBORAH WEINSTEIN, ESQUIRE
Connolly, Epstein, Chicco, Foxman,
Oxholm & Ewing
1515 Market Street, Suite 900
Philadelphia, Pennsylvania 19102

Attorneys for Appellees,
Jamil Doe, a minor, by his
parents and guardians Sarah Doe
and William Doe; Sarah Doe;
William Doe; Latiya Smith, a
minor, by her guardian Ruth
Lowe; Rosetta Davis, a minor, by
her guardian Barbara Zlotowski;
Adrian Jones, a minor, by her
guardian Gail Sosnov; Natasha
Brown, a minor, by her mother
and guardian Venita Bracy; Joan
Adler, M.D.; ActionAIDS, Inc.;
Family Planning Council of
Southeastern Pennsylvania, Inc.;
Planned Parenthood of
Southeastern Pennsylvania

3

OPINION OF THE COURT

SCIRICA, Circuit Judge.

The issue on appeal is whether a board of education exceeded its authority by implementing a consensual program to distribute condoms in public schools in order to prevent disease. Because the Philadelphia School Board acted within its statutory and regulatory authority, and because the policy neither coerces parental or student participation nor offends the rights of parents to direct the care and custody of their children, we will affirm.

Plaintiffs, Parents United for Better Schools, Inc. and several individually listed parents of Philadelphia public high school students brought this declaratory judgment action against the School District of Philadelphia Board of Education; President of the School Board; and the Superintendent of Schools. Several parties intervened: individually listed students in Philadelphia public schools and their parents, ActionAIDS, Inc., the Family Planning Council of Southeastern Pennsylvania, Inc., and Planned Parenthood of Southeastern Pennsylvania. Plaintiffs appeal the district court's order granting defendants' motion for summary judgment. See Parents United for Better Schs., Inc. v. School Dist. of Phila. Bd. of Educ., 978 F. Supp. 197 (E.D. Pa. 1997).

I.

A.

The Pennsylvania Constitution entrusts the legislature with the responsibility of providing for public education. See Pa. Const. Art. 3 S 14 ("The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education"). "In meeting its responsibility, the General Assembly has established a comprehensive legislative scheme governing the operation and administration of public education." Pennsylvania

4

Fed'n of Teachers v. Sch. Dist. of Phila., 484 A.2d 751, 753 (Pa. 1984) (citation omitted).1

On June 24, 1991, acting under the School Code and the Philadelphia Home Rule Charter, the Board adopted Policy Number 123, entitled "Adolescent Sexuality." According to the Board "adolescent pregnancy, sexually transmitted diseases, and HIV infection are epidemic among school age youth . . . . [T]he Board recognizes that schools, in concert with all segments of the Philadelphia community, have an obligation to promote a healthy lifestyle for all adolescents." (App. 36). The Board enunciated a broad purpose:

> 1.1 The Board of Education reaffirms its policy to provide comprehensive human growth and development instruction to all public school students. In accordance with School District policy and state law, such instruction should be part of the public school program and should be shared by the public schools, home, and community. The primary purposes of such instruction are to promote more wholesome family and interpersonal relationships; to help young people understand their sexuality at all levels of development; and to develop healthy habits and moral values regarding human sexuality.
>
> 1.2 The Board recognizes that the expression of human sexual behavior can be the source of many of life's most meaningful experiences as well as its most

_____

1. "The organization of [Pennsylvania's] public school system is controlled by the Public School Code of 1949 (School Code)[24 Pa. Stat. Ann. SS 1-101 - 27-2702 (West 1992)]." Philadelphia Fed'n of Teachers, Local No. 3 v. Board of Educ. of the Sch. Dist. of Phila., 414 A.2d 424, 426 (Pa. Commw. Ct. 1980) (citation omitted). "School Districts act as agencies of the state legislature in administering the educational program within the district." Chambersburg Area Sch. Dist. v. Pennsylvania Labor Relations Bd., 430 A.2d 740, 743 (Pa. Commw. Ct. 1981) (citation omitted), appeal dismissed, 446 A.2d 603 (Pa. 1982). See also Barth v. School Dist. of Phila., 143 A.2d 909, 912 (Pa. 1958) ("the School District of Philadelphia is an agent or creature of the Legislature"); Kaufman v. Central Susquehanna Intermediate Unit No. 16, 601 A.2d 412, 414 (Pa. Commw. Ct. 1991) ("The legislature has established that each school district and intermediate unit shall have, inter alia, a board of directors and has set forth the powers and duties of each") (citation omitted).

painful problems; and the Board of Education firmly asserts that abstinence from sexual activity during adolescence promotes good health and a healthy lifestyle.

1.3 The Board of Education firmly believes that successful pursuit of the mission of promoting a healthy lifestyle for all adolescents depends upon the cooperation of a broad spectrum of the Philadelphia community, including schools, families, religious institutions, health care providers, social service agencies, businesses, government, and media.

(App. 37). The Board described the Policy's objectives as follows:

2.1.a. To enable and encourage students to abs tain from sexual intercourse until ready to enter marriage or another mutually monogamous relationship.

2.1.b. To reduce high risk sexual behavior lea ding to teen pregnancy, sexually transmitted diseases and HIV infection.

2.1.c. To assure a safe, equitable and positiv e school experience for lesbian and gay students.

2.1.d. To assure that all programs and activit ies take into consideration the broad spectrum of ethnic and cultural diversities, as well as mental and physical disabilities.

(App. 38). To effectuate the aforementioned objectives, the Board prescribed specific curricula:

3.1 The Superintendent shall direct the development and acquisition of curricula which comprehensively promote healthy behavior and which shall be taught in all grade levels, pre-kindergarten through grade twelve. Such curricula shall focus on behavioral outcomes and effective methods to convey the message that abstinence is the most effective way of preventing pregnancy, sexually transmitted diseases and HIV infection; a voluntary parental education component, designed to enhance the frequency and effectiveness of parents' communication with their

6

children; and a mechanism for monitoring the efficacy
of the curricula.

(Id.). The policy also empowers the Superintendent "to
develop additional partnerships with health care providers
that expand and maximize access to in-school
comprehensive health care for all children." (App. 39).

The cornerstone of the policy, and its most controversial
provision, is its directive to facilitate student access to
condoms:

>3.4 The Board believes that the effectiveness of the
curricula to promote healthy lifestyles and to prevent
pregnancy, sexually transmitted diseases and HIV
infection is enhanced for sexually active students by
facilitating their access to condoms outside of school.
Toward that end, the Board supports the School
District's involvement in city wide efforts to maximize
access to condoms.

>3.5 The Board of Education directs the
Superintendent to immediately initiate the design of a
pilot, educationally-based program, permitting in-
school availability of condoms and the counseling of
students in the use of same, utilizing established non-
School District health care and social service providers,
in partnership with participating schools. Such
programs shall commence not later than the Fall of
1991.

>3.6 The phased-in pilot program of condom
availability in schools shall apply only to students in
grades nine through twelve.

\* \* \*

>3.7 A component of the phase in pilot program shall
be specifically for the education of parents, designed to
enhance the frequency and effectiveness of parents'
communication with their children about sexuality.

(App. 38-39). Schools employ two models for condom
distribution:

>One model, which shall be referred to as the
comprehensive School Based Clinic model, has

7

> professionally-trained health educators and clinicians
> provide health and sexuality information as well as
> condoms through existing school health clinics . . ..
> The second model, Health Resource Centers,
> establishes separate centers inside high schools,
> staffed by experienced counselors or social workers,
> where teens can go to receive condoms with counseling
> and health and sexuality information. No health care
> services are provided in these Centers. Rather,
> students are referred to services in the community.

(App. 298).

The Board does not fund the program. (App. 41). The
health resource centers receive funding through private and
non-school district sources and under the Public Health
Service Act, 42 U.S.C.A. SS 201-300aaa-13 (West 1991 &
Supp. 1998). (App. 461, 475 ("The Council continues to
fund comprehensive family planning services through
subcontracting agencies . . . . [c]ouncil subcontracts now
fund all nine of the condom availability sites . . .. Four of
the nine sites are funded by Title X monies")). See also 42
U.S.C.A. S 300(a) ("The Secretary is authorized to make
grants and to enter into contracts with public or nonprofit
private entities to assist in the establishment and operation
of voluntary family planning projects which shall offer a
broad range of acceptable and effective family planning
methods and services").

The condom distribution program specifically gives
parents the option of refusing to let their child participate:

> 4.1 Parents or guardians of students in schools
> taking part in the phase-in pilot program shall have
> the absolute right to veto their child's or children's
> participation in the program.

(App. 39-40) (opt out provision). If a parent returns an opt
out form, the counselor will not supply that student with
condoms. If an opt out form is not on file, the counselor
discusses the virtues of abstinence with the student. In the
event the student still requests condoms, the counselor
supplies them after providing instructions for their proper
use.

8

The condom distribution program began on December 21, 1991 when letters were mass-mailed to parents by the principals of schools with pilot programs advising them of the availability of condoms to students as part of the "health services" program, stating, in part:

> As one part of providing new and important health services to protect children, the Board now permits any high school student who asks for a condom to receive one in our school. If a high school student asks for a condom in school, that student will also be given counseling and education including the importance of abstinence, from a doctor, a nurse or a social worker.

* * *

> Please fill out the enclosed form if you do not wish your child to be able to participate in this program. Please mail it back . . . within two weeks.

> If you believe that this important health service should be available to your child you do not have to send back your form.

(App. 76). As of September 12, 1997, condom availability programs were operating in nine of Philadelphia's forty public schools.

B.

1.

On January 13, 1992, Plaintiffs filed a complaint in the Philadelphia County Court of Common Pleas seeking a permanent injunction and declaratory relief. Count I alleged the policy violates the Pennsylvania Code because it emphasizes the use of condoms to prevent the spread of AIDS instead of abstinence, a formalized curricula, and AIDS education. Count II claimed the policy's opt out provision illegally usurps common law and statutorily guaranteed parental rights of permission before their children receive medical or health services because it requires parents to veto the participation of their child in the condom program. (See App. 13 (Compl.PP 17-18)).

9

Count III and Count IV maintained the condom distribution program violates 18 Pa. Cons. Stat. S 4304 ("Endangering welfare of children") (West Supp. 1998) because it, inter alia, encourages abstinent children to engage in sexual activity and increases the sexual activity of children who are already sexually active. Count V claimed the condom distribution policy offends the provision in the Philadelphia City Municipal Code allowing for " `reasonable requirements to insure or require the control of the spread of communicable diseases' in schools or institutions . . . because it promotes condom use alone." (App. 17 (Compl. PP 32-33)). Finally, Count VI asserted the Policy itself has been violated because "no such curricula emphasizing the efficiency of abstinence and no evaluation criteria or monitoring was in place when the condom distribution began" and "Defendants have not notified all affected parents of their right to veto nor do they have any effective mechanism to insure all affected parents are notified of their absolute veto power." (App. 20 (Compl. PP 37-41)).[2]

On November 10, 1992, the Court of Common Pleas granted defendant's motion for summary judgment, finding plaintiffs lacked standing to bring the lawsuit because the policy allows parents to veto their children's participation. On appeal, the Pennsylvania Commonwealth Court reversed, finding Plaintiffs "(1) identified a substantial interest, i.e., prior express parental consent to medical treatment; (2) which interest is directly affected by the action of the Board; and (3) the consequences of the Board's action affecting that interest are immediate." Parents United for Betters Schs., Inc. v. School Dist. of Phila., 646 A.2d 689, 693 (Pa. Commw. Ct. 1994).

In March, 1996, defendants filed another motion for summary judgment which the Court of Common Pleas denied. In opposing defendants' motion, plaintiffs alleged federal substantive due process guaranteed them unfettered discretion in raising their children. That federal claim prompted defendants to remove the case to the

_____

2. Count VII alleged the Policy runs afoul of 18 Pa. Cons. Stat. S 6301 ("Corruption of minors") (West Supp. 1998). Plaintiffs abandoned both this claim and Count IV. See Parents, 978 F. Supp. at 212 n.7.

10

United States District Court for the Eastern District of
Pennsylvania on May 17, 1996, and the district court
denied plaintiffs' subsequent motion to remand.

C.

1.

In deciding the motion for summary judgment,[3] the

_____

3. All parties submitted affidavits in support of and in opposition to the
summary judgment motion. Defendants supplied affidavits averring (1)
the School District of Philadelphia does not dispense funds for the
condom distribution program; (2) giving or receiving a condom is not a
medical service requiring medical training or supervision; and (3)
confidentiality is particularly important to a minor's use of these
services; ease of access tends to ensure consistent use. (App. 41, 64,
253).

Students submitted affidavits stating (1) having condoms in the
resource centers does not increase sexual activity but rather increases
the incidence of condom use; (2) students use the resource centers to get
condoms; and (3) most of them would not ask their parents to sign the
consent form. Defendants also supplied affidavits from physicians
declaring (1) most sexually active adolescents either fail to use
precautions against pregnancy and disease or use these preventive
measures inconsistently or improperly; (2) adolescents face obstacles in
obtaining condoms or other devices that prevent pregnancy; (3) there is
no evidence that providing minors access to contraceptives without
parental consent, in schools or elsewhere, increases their sexual
activity;
and (4) a well designed, school based program to make condoms
available together with counseling on alternative means of protection
from the hazards of unsafe sex, such as abstinence, can be effective in
reducing pregnancy.

Defendants also provided statistical evidence. Between September
1993 and June 1994, 4,650 students made 16,224 visits to the school
based clinics and health resource centers. These 4,650 students
represent 24% of the total number of students enrolled at the high
schools offering condom availability programs. Seventy-one percent
(71%) of the students who visited the school based clinics and health
resource centers received condoms at the time of their initial visit. Of
the
students for whom condom distribution information was available, only
of 1% (23) were denied condoms because of parental requests to bar
condom availability to their children. Of the 16,060 visits (74%) that

11

district court rejected plaintiffs' argument that the Board's broad powers do not include the power to implement the condom program, finding the Board was fulfilling its educational mandate.

The district court also rejected Plaintiffs' argument that

_____

were made to the centers and clinics, students received condoms in 11,810.

Generally, five condoms are distributed at each visit. Seventy percent (70%) of students using the centers and clinics received counseling on abstinence at the time of their initial visit. (App. 299-300). The number of students using services increased from 3,030 in the 1992-93 school year to 4,404 for 1993-94. The percentage of visits in which condoms were distributed increased from 62% in 1992-93 to 74% in 1993-94, and the number of initial visits at which condoms were received increased from 2,071 to 3,114 respectively. Also, the percentage receiving condoms during initial visits increased slightly from 68% to 71%. (App. 300-01). See also Parents United for Better Schs., Inc. v. School Dist. of Phila. Bd. of Educ., 978 F. Supp. 197, 200 (E.D. Pa. 1997) ("In the 1995-96 school year, 5,400 students visited the health resource centers at which condoms are available. Seventy-five percent of those students received condoms . . . . counselors made 686 referrals to health care providers for sexually transmitted diseases, HIV screening, or treatment, and made 984 referrals . . . for pregnancy or birth control needs").

In opposition, plaintiffs submitted, inter alia, the deposition of a public school nurse, averring she (1) does not obtain parental permission before cleansing a laceration; (2) does not hand out toothbrushes, toothpaste, or tampons but does hand out sanitary napkins; (3) follows a standing order issued to parents who have consented to the dispensing of Tylenol; and (4) neither checks male genitalia nor performs internal examinations on women. (App. 86-114).

Plaintiffs also supplied the affidavit of the president of Parents United for Better Schools, stating staff members made phone calls to 100 randomly selected members who have children in the schools where condoms are presently distributed under the policy. Only 21% said they had received letters advising them of the policy, while 79% said they had never received a letter from the School District. (App. 116). Plaintiffs' expert's affidavit concluded the condom distribution program provides health services to "the extent it entails institutionalized dispensation of condoms for students for actual use as a protection against sexually transmitted diseases and HIV infection . . . . [I]t is not a form of education." (App. 118-23).

12

the statutory provision on school health services, 24 Pa.
Stat. S 14-1402,4 which does not include condom
_____

4. The statute provides, in part:

     (a) Each child of school age shall be given by methods established
     by the Advisory Health Board, (1) a vision test by a school nurse,
     medical technician or teacher, (2) a hearing test by a school nurse
     or medical technician, (3) a measurement of height and weight by a
     school nurse or teacher, (4) tests for tuberculosis under medical
     supervision, and (5) such other tests as the Advisory Health Board
     may deem advisable to protect the health of the child.

* * *

     (a.1) Every child of school age shall be provided with school
nurse
     services.

* * *

     (b) For each child of school age, a comprehensive health record
     shall be maintained by the school district or joint school board,
     which shall include the results of the tests, measurements and
     regularly scheduled examinations and special examinations herein
     specified.

     (c) Medical questionnaires, suitable for diagnostic purposes,
     furnished by the Secretary of Health and completed by the child or
     by the child's parent or guardian, at such times as the Secretary
of
     Health may direct, shall become part of the child's health record.

     (d) All teachers shall report to the school nurse or school
     physician any unusual behavior, changes in physical appearance,
     changes in attendance habits and changes in scholastic
     achievement, which may indicate impairment of a child's health.

* * *

     (e) The school physicians of each district or joint board shall
make
     a medical examination and a comprehensive appraisal of the health
     of every child of school age.

* * *

     (f) The Secretary of Health, upon petition of the school board or
     joint school board or on his own initiative with the concurrence of
     the school board or joint school board, may modify for individual

school districts the school health services program specified in this
section. The program as modified shall conform to approved medical
or dental practices and shall permit valid statistical appraisals of the
various components of the program.

24 Pa. Stat. Ann. S 14-1402.

distribution, shows a clear legislative intent to restrict, rather than expand, allowable school based health services. Plaintiffs unsuccessfully argued to the district court that the absence of explicit statutory authorization to distribute condoms in 24 Pa. Stat. S 14-1402 suggests the condom program lies beyond the scope of the school district's authority. The district court stated:

> I agree that condom distribution is within the implied definition of health services. In the Code, the Legislature adopts a broad meaning for health service, as indicated by the enumerated services, which include hearing and vision tests, tests for tuberculosis, and height and weight measurements. These services relate to the evaluation and preservation of students' health. Condoms, too, involve health preservation. While it requires very little training to use a condom in a medically correct way, neither does it require great medical expertise to measure a child's weight and height. Because a condom is a prophylactic measure to preserve health by reducing the risk of sexually transmitted disease, it is a health service within the meaning of the School Code.

> I disagree, however, that the health services provision forbids condom distribution programs. The caption for the Code section relating to this statutory provision reads `Required health services.' While the legislature mandates the provision of certain health services, nothing in the statute forbids a school district from providing additional services, particularly where, as here, no school district funds are being spent.

Parents, 978 F. Supp. at 203.

The district court also rejected plaintiffs' attempts to link their health services argument with their position that the Home Rule Charter, 351 Pa. Code S 12.12-309 (1998), authorizes only those cooperative agreements to provide health services that are specifically mandated by law, i.e., explicitly mentioned in 24 Pa. Stat. S 14-1402:

> The statutes and regulations regarding mandatory health services already prescribe the means by which the schools must deliver those services. See e.g., 24 Pa.

14

Cons. Stat. Ann. S 14-1401 (defining school health personnel); S 14-1410 (governing `employment of school health personnel'); S 14-1411 (governing public contracts for health services with local health departments); 28 Pa. Code SS 23.32(b), 23.33(b), 23.34, 23.35(b) (governing employment of school health personnel). Section 12.12-309, in contrast, broadly authorizes cooperative agreements `relating to health services' whenever a school board determines that such agreements would enhance the effective administration of public education. This provision cannot apply to the mandated health services because these must be delivered through direct hiring and contracts as specified by law. To have meaning, S 12.12-309 must apply instead to other health-related services, such as the condom program, which are not mandated but which school districts have the discretion to offer. Further, as discussed below, the school district could distribute condoms in schools not as a health service to students, but as an effective means of fulfilling its educational mandate by targeting those students most at risk.

Parents, 978 F. Supp. at 204.

2.

According to the district court, a statutory provision authorizing the Board to educate students about health and hygiene supports the conclusion the Board did not exceed its power by implementing the condom program. See 24 Pa. Stat. S 15-1513 ("Physiology and hygiene, which shall in each division of the subject so pursued include special reference to the effect of alcoholic drinks, stimulants, and narcotics upon the human system, and which shall also include special reference to tuberculosis and its prevention, shall be introduced and studied as a regular branch"). The district court also looked to regulations under the School Code it felt reflected the Board's concerns. See 22 Pa. Code S 5.201(e)(8) ("Each student shall acquire and use the knowledge and skills necessary to promote individual and family health and wellness"); 22 Pa. Stat. S 5.202(f)(8) (iii) ("School Districts

15

shall prepare all students to attain the following student learning outcomes . . . . All students demonstrate their knowledge of the benefits associated with physicalfitness and good personal health habits including health promotion and disease prevention"); 22 Pa. Code. S 5.213 ("Planned courses that provide instruction in the following areas shall be taught to every student in the high school program . . . . Wellness and fitness, incorporating physical education, aerobic fitness, regular physical activity and health and instruction every year about prevention of alcohol, chemical and tobacco abuse").

As the district court noted, these regulations specify education about the prevention of sexually transmitted disease: "[i]nstruction regarding prevention of human immunodeficiency virus (HIV) infestation/acquired immunodeficiency syndrome (AIDS) shall be given for primary, intermediate, middle school and high school education." 22 Pa. Code S 5.220(a). The regulations delegate authority with respect to the means of instruction to the local school districts:

> Educational materials and instruction shall be determined by the local school district and be appropriate to the age group being taught. The program of instruction shall include information about the nature of the disease, the lack of a cure, the ways the disease is transmitted and how infection can be prevented . . . . Programs discussing transmission through sexual activity shall stress that abstinence from sexual activity is the only completely reliable means of preventing sexual transmission.

22 Pa. Code S 5.220(b). Based on the regulations, the district court concluded the Board could rationally decide to permit access to condoms to further health and health education:

> Curricula developed under Policy 123 teach students about HIV and its consequences, among other things. Stressing abstinence, these curricula wisely include instruction in another form of prevention, namely the use of a prophylactics. Following this instruction, if not before, students will know that condoms can help

16

prevent the spread of HIV and other sexually transmitted diseases. The School District knows that these students may obtain condoms from a variety of sources, including pharmacies, clinics, and even in certain rest rooms. In-school access to condoms does not give the students significantly greater ability to obtain condoms than they would have without the program. It does, however, come at a price that furthers the School District's educational mission: students who obtain condoms in the school must receive a lecture on abstinence, and learn how to use condoms properly. The condom distribution program gives the School District opportunity to urge students not to engage in sexual activity. The program also thus targets those students most at risk of contracting a social disease, i.e., those who intend to engage in sexual relations. The School District thus ensures that the students know how to use condoms correctly. The student who buys condoms from a drug store does not necessarily receive this instruction; the one who gets them through the in-school program does. Thus, the program promotes the education of school students in physiology and hygiene, as authorized and required by the School Code.

Parents, 978 F. Supp. at 205.5

3.

The district court rejected Plaintiffs' claim that condom distribution violated common law parental consent requirements. See e.g., Parents United for Better Schs., Inc. v. School Dist. of Phila. Bd. of Educ., 646 A.2d 689, 691 (Pa. Commw. Ct. 1994) ("The principle that parental consent must be secured before medical treatment [is] provided is time honored . . . . Generally, it is for the parent in the first

_____

5. Plaintiffs unsuccessfully asserted the Board abused its discretion. The district court determined the Board acted within its statutory authority, displaying neither ignorance nor caprice. See id. at 206 ("To the contrary, the Board of Education held multiple hearings and conducted a thorough examination of the reasons for, and implications of, distributing condoms in public schools").

17

instance to decide what is actually necessary for the protection and preservation of the life of his or her child") (citations omitted). The district court found condom distribution is not medical treatment:

> [P]ersons dispensing the condoms may have no medical training, perform no surgical procedures on the students, and intend no contact with them. Thus, they no more need parents' consent to dispense condoms to a student than a pharmacist would need that consent to sell the minor students condoms in a drug store.

> More generally, medical treatment tends to come after the fact . . . . Condoms . . . are prophylactic . . . non-invasive, are not used to diagnose or cure disease, and do not require medical training or supervision for their use. Because condom distribution is not a medical treatment, it would not fall within the common-law rule.

* * *

> Plaintiffs, however, would expand the common law rule beyond curative procedures involving physical contact by arguing that health services, such as condom distribution, also require parental consent. I agree that condom distribution is health-related. Whether condoms are used can have a significant impact upon a person's health. When used properly, condoms serve as a barrier for germs, bacteria and viruses, thus keeping contagious little disease generators from passing from one person's body into another's, thereby infecting, perhaps fatally, the other person. Not all condoms are totally impermeable, and thus, they are not all perfect. But they do reduce the risk of infection with sexually transmitted diseases. Because condom usage may help to preserve health, their distribution is a health service, within the ordinary meaning of that term. Impact upon health, however, does not transform a health service into a medical treatment. Health services, by definition, encompass far more than medical treatment. Because the cases requiring parental consent speak only to medical treatment, I will not engraft a common-law

18

> consent requirement onto the much broader category
> of health services.

Parents, 978 F. Supp. at 207.

The district court incorporated the same reasoning with the respect to plaintiffs' assertion that the distribution of condoms without prior parental consent violates the Minor's Consent Act, 35 Pa. Stat. SS 10101–10105 (West 1993), providing "[a]ny minor who is eighteen years of age or older, or has graduated from high school, or has married, or has been pregnant, may give effective consent to medical, dental and health services for himself or herself." 35 Pa. Stat. S 10101. Plaintiffs argued that because condom distribution is not an enumerated exception within the Act, parental consent is required. The district court disagreed:

> a provision of the Act permits minors to consent to
> `medical and health services to determine the presence
> of or to treat pregnancy, and venereal disease and the
> consent of no other person shall be necessary.' 35 Pa.
> Stat. Ann. S 10103. On the one hand, the Legislature
> easily could have inserted `to prevent' before`to
> determine.' On the other hand, it seems absurd for the
> legislature to allow minors to consent to treatment
> once they are pregnant or infected with a sexually
> transmitted disease, but forbid them to obtain
> contraceptives to prevent those conditions without
> parental consent.

* * *

> Further, the very terms of the statute express an
> intent to liberalize the circumstances under which
> minors can receive medical care. This liberalization
> finds expression in the statute's title: `An Act enabling
> certain minors to consent to medical, dental and health
> services.' If, by negative implication, the statute
> disables minors from providing consent in any
> circumstances not enumerated, it would restrict the
> very rights it means to expand.

Parents, 978 F. Supp. at 208 (citations omitted).

19

4.

The district court accepted defendants' argument that federal statutory rights under the Public Health Service Act, specifically 42 U.S.C.A. S 300(a), bar the imposition of a parental consent requirement. According to the district court, services under this statutory scheme include the provision of contraceptives, and "all circuit courts which have considered the issue have concluded that parental consent cannot be required before a minor receives these services." Id. at 208 (citation omitted). Thus, "[i]f Pennsylvania's Minor Consent Act requires parental consent before providing contraceptives, it must yield to federal confidentiality requirements whenever a minor seeks contraceptives through [programs funded under this statutory scheme]." Id. at 209.

According to the district court, students' privacy rights warranted the same freedom from a parental consent requirement:

> Constitutional protection for minors is critical because pregnancy and sexually transmitted diseases impact as heavily, if not more heavily, upon minors.
>
>  During the past two decades, the Supreme Court consistently has rejected blanket parental consent requirements for abortions, holding instead that minors must have recourse to courts if they will not or cannot obtain their parents' consent . . . . Access to contraceptives may be just as important as access to abortions: `the decision whether to use contraceptives is as intimate and personal as, and involves risks to the individual which are comparable to those raised by the decision whether to have an abortion.' Planned Parenthood Ass'n of Utah v. Matheson, 582 F. Supp. 1001, 1009 (D. Utah 1983). But states have even less interest in regulating minors' access to contraception than in regulating minors' access to abortion. Thus, the Constitution forecloses an interpretation of Pennsylvania law that would compel parental consent whenever a minor seeks contraceptives.

Parents, 978 F. Supp. at 209 (citations omitted).

20

5.

In assessing the constitutionality of the condom distribution program, the district court focused on plaintiffs' claim that parents are coerced into participating in the program, in contravention to their Fourteenth Amendment liberty interest and right to be free from unnecessary governmental intrusion in the rearing of their children. Plaintiffs characterized the opt out provision as coercive, arguing it forces parents to affirmatively respond to insure their children do not participate in the condom distribution program. The district court found no coercion:

> [s]o also, just as the condom program at issue here is not coercive upon the parents, nor is it coercive upon the students. Students may be compelled to attend school, but they are not compelled to participate in the condom program. Student use of the health resource centers is entirely voluntary. Further, parents are free to instruct their children not to use the program, and may even actively prevent their children's participation by sending an opt out letter to the school. In fact, the opt out provision encourages parental involvement by notifying them of the school program and permitting them to forbid their children to use it. Because it allows parents to restrict children's in-school access to condoms, the provision gives parents more authority to control their children. The opt out provision supports, not burdens, parental rights. Parents thus remain free to exercise their traditional care, custody and control over their emancipated children.

Parents, 978 F. Supp. at 211 (citation omitted).

6.

Finally, the district court concluded plaintiffs could not prove defendants committed an offense under 18 Pa. Cons. Stat. Ann. S 4304(a) ("A parent, guardian, or other person supervising the welfare of a child under 18 years of age commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support"):

21

> [Plaintiffs] cannot show either that the condom
> program endangers children or that the defendants had
> the requisite intent. If in-school distribution of
> condoms increases sexual activity, Plaintiffs might
> show endangerment. But Plaintiffs have provided no
> evidence linking condom distribution to increased
> sexual activity. Further, while improper use of
> condoms can be dangerous, failing to use condoms
> puts sexually active children at even greater risk. If
> anything, the danger to the children would be
> increased were this condom program quashed. Thus,
> Plaintiffs have not shown that the condom program
> endangers children. Without a showing of
> endangerment, there can be no liability.
>
> Even if Plaintiffs could show that the condom
> program endangers children, they cannot prove that
> the defendants had the requisite intent. Rather, the
> record evidences the defendants' belief that the
> program promotes students' health and welfare, not
> that it endangers them. The mere possibility,
> unsupported by the record, that Defendants might be
> mistaken in their belief, as Plaintiffs' argue, cannot
> support a claim for child endangerment.

Id. at 212-13.

II.

We have jurisdiction over this appeal under 28 U.S.C.
S 1291. "Since this is an appeal from a district court's
granting of summary judgment, we exercise plenary
review." DeBlasio v. Zoning Bd. of Adjustment for the
Township of West Amwell, 53 F.3d 592, 596 (3d Cir. 1995)
(citation omitted), cert. denied, 516 U.S. 937 (1995).

III.

A.

1.

Plaintiffs maintain the Board only enjoys that authority
explicitly granted by the legislature. In the absence of

express statutory authorization to provide a new health service, plaintiffs contend the Board exceeded its powers by implementing a program operated exclusively by non-school district personnel who provide a service never before offered by any school district in Pennsylvania. Plaintiffs also characterize the health services offered as too remote from education, the primary function of the Board, citing Barth v. School Dist. of Phila., 143 A.2d 909 (Pa. 1958) (invalidating agreement between the Board and the City to establish and finance a youth conservation commission to serve as an instrumentality for curbing juvenile delinquency because "the main purpose of this agreement is, at best, very indirectly and very remotely connected with Education. Virtually all of the work contemplated by this Agreement would be performed (a) outside of the schools, and (b) by an independent agency").

We believe plaintiffs have too restrictive a view of Board authority. The General Assembly delegated broad powers to the Board to execute the School Code and effectuate its underlying policies. "School authorities must be given broad discretionary powers to ensure a better education for the children of this Commonwealth and any restrictions on the exercise of these powers must be strictly construed." Smith v. Darby Sch. Dist., 130 A.2d 661, 668-69 (Pa. 1957). See also Pennsylvania Fed'n of Teachers v. School Dist. of Phila., 484 A.2d 751, 753 (Pa. 1984) ("the General Assembly has established a comprehensive legislative scheme governing the operation and administration of public education. Those local agencies created to administer the system have been delegated broad powers"); Chambersburg Area Sch. Dist. v. Pennsylvania Labor Relations Bd., 430 A.2d 740, 743 (Pa. Commw. Ct. 1981) ("School districts are given broad powers to determine policy relative to education by the Public School Code of 1949") (citations omitted).

The statutory scheme devised by the General Assembly, specifically the School Code, contains several provisions manifesting legislative intent to invest the Board with such power. 24 Pa. Stat. Ann. S 2-211 provides,"[t]he several school districts in this Commonwealth shall be, and hereby are vested as, bodies corporate, with all necessary powers to enable them to carry out the provisions of this act." See

23

also 24 Pa. Stat. Ann. S 21-2103 (listing Board duties, including, inter alia, "(1) [t]o define the general policies of the school system, (2) [t]o legislate upon all matters pertaining thereto . . . (7) [i]n general to legislate upon all matters concerning the conduct of the schools subject to the provisions of this act").

More specifically, "the board of school directors in any school district may establish, equip, furnish, and maintain . . . additional schools or departments for the education and recreation of persons residing in said district, and for the proper operation of its schools." 24 Pa. Stat. Ann. S 5-502. See Harris v. Board of Pub. Educ. of Sch. Dist. of Phila., 160 A. 443, 443 (1932) (describing related provision: "[i]n broad terms, it reposes a wide discretion in the school board to institute, besides specifically named classes of schools of educational departments, such other schools or educational departments as they, in their wisdom, may see proper to establish").6

Among these powers is the authority to enter into agreements:

---

6. Article 5 of the School Code enunciates the wide array of Board duties and responsibilities. See e.g., S 5-504 (empowering Board to "establish, equip, maintain, and operate cafeterias"); S 5-505 (authorizing Board to "establish, equip, furnish, and maintain consolidated schools formed by uniting two or more public schools"); S 5-507 (providing Board, when necessary to "establish, enlarge, equip, furnish, operate, and maintain any schools or departments herein provided," with power and authority to "levy and collect, in the manner herein provided, the necessary taxes required"); S 5-510 (authorizing Board to "adopt and enforce such reasonable rules and regulations as it may deem necessary and proper, regarding the management of its school affairs and the conduct and deportment of [pupils]"); S 5-511 (empowering Board to "prescribe, adopt, and enforce such reasonable rules and regulations as it may deem proper, regarding . . . exercises, athletics . . . school publications, debating, forensic, dramatic, musical, and other activities related to the school program"); S 5-513 (authorizing school districts to "make contracts of insurance with any insurance company, or nonprofit hospitalization corporation, or nonprofit medical service corporation, authorized to transact business within the Commonwealth"); S 5-523 (requiring Board to "adopt and amend, when necessary, a State Plan for Educational Broadcasting").

24

Nothing in this act shall be construed as constituting a prohibition against agreements including, but not limited to, joint tax collection, joint purchasing of supplies, equipment and contractual services, use of recreational and park equipment and facilities, control and prevention of juvenile delinquency, city planning, capital budgeting, capital programming and comprehensive development planning, with any municipal or former county department, agency, office, board or commission or any agency of the Commonwealth or the United States Government, when, in the opinion of a duly constituted board of education of the home rule school district or its authorized agents, such agreement will further the efficient and effective administration of public education.

53 Pa. Stat. S 13219(b) (emphasis supplied).

The Home Rule Charter, authorized by 53 Pa. Stat. Ann. S 13202 (West Supp. 1997) (allowing Philadelphia to "adopt charter provisions governing the administration of a separate and independent home rule school district"), also suggests the Board enjoys broad powers. See 351 Pa. Code S 12.12-200 (1998) ("There shall be a Board of Education of the School District of Philadelphia which shall be charged with the administration, management and operation of the home rule school district"); 351 Pa. Code S 12.12-300 (1998) ("To enable it to administer, manage, and operate the School District of Philadelphia, the Board of Education shall have the powers and duties enumerated herein and any other powers and duties, not inconsistent with law, which are necessary to carry into effect the powers and duties conferred upon it in this Article"). See e.g., Simmons v. City of Phila., 947 F.2d 1042, 1097 (3d Cir. 1991) ("Philadelphia has been . . . granted certain powers by a Home Rule Charter") (citation omitted), cert. denied, 503 U.S. 985 (1992); Pennsylvania Human Relations Comm'n v. School Dist. of Phila., 681 A.2d 1366, 1379 (Pa. Commw. Ct. 1996) ("The City conducts its affairs pursuant to the Philadelphia Home Rule Charter") (citation omitted).

The Home Rule Charter contains a provision that mirrors 53 Pa. Stat. Ann. S 13219(b) but provides additional

25

authority to enter into agreements relating to "health services with any department, agency, office, board or commission of the City, or with an agency of the Commonwealth or of the United States, or with any non-profit private agency, when, in the opinion of the Board, such agreement will further the efficient and effective administration of public education." 351 Pa. CodeS 12.12-309(a) (1998) (emphasis supplied).

An examination of considerable statutory and regulatory authority granted to the Board by the General Assembly supports the conclusion that the Board acted within its broad discretionary powers when implementing the condom distribution program. The School Code specifically grants necessary powers to enable the Board to effectuate the provisions of that Act, including the power to create "[s]uch other schools or educational departments as the directors, in their wisdom, may see proper to establish." 24 Pa. Stat. S 5-502. One of these provisions explicitly authorizes the Board to enter into agreements that, in the opinion of the Board, "will further the efficient and effective administration of public education." 53 Pa. Stat. S 13219(b). Although S 13219(b) does not specifically provide for health services, the range of permissible agreements is "not limited to" those listed in the statute. Id.

Similarly, the Home Rule Charter charges the Board with the administration, management and operation of school districts. A provision mirroring S 13219(b) enables the Board to enter into agreements for health services, like the partnerships used to administer the condom distribution program, "when, in the opinion of the Board, such agreement will further the efficient and effective administration of public education." 351 Pa. CodeS 12.12-309(a). The Home Rule Charter has a strong impact on existing law:

Any charter provisions thus proposed, which are approved by a majority of the qualified electors voting thereon, shall become the organic law, or a part thereof, of the city at such time as may be fixed therein and all courts shall take judicial notice thereof. So far as the same are consistent with the grant of powers and the limitations, restrictions and regulations

26

> hereinafter prescribed, they shall supersede all acts, or
> parts of acts, local, special or general, affecting the
> organization, government and powers of such school
> district to the extent that they are inconsistent or in
> conflict therewith.

53 Pa. Stat. S 13212 (West Supp. 1998).

We agree with the district court that the Board fulfills its
educational mandate by attempting to promote health
services designed to prevent disease.7

2.

According to plaintiffs, the School Code, specifically 24
Pa. Stat. S 14-1402, contains an exclusive list of health
services the Board may administer to students. School
nurses, argue plaintiffs, are only authorized to provide
limited first aid and must defer to parents before offering

_____

7. We consider Plaintiffs' reliance on Barth v. School Dist. of Phila.,
143
A.2d 909 (Pa. 1958) misplaced. Barth found the juvenile delinquency
program remotely connected with education because it focused on
matters "embraced not in Education but in the age-old functions and
duties of Government." Id. at 912. Barth also noted the program was
performed outside of school by independent agencies. Here, the Board's
policy is carried out in school by health care providers acting in
partnership with participating schools. Furthermore, both 53 Pa. Stat.
S 13219 and 351 Pa. Code. S 12.12-309(a) expressly authorize
cooperative programs to address health services.

Plaintiffs also cite Guerrieri v. Tyson, 24 A.2d 468 (Pa. Super. Ct.
1942), contending the Board's power to direct and control health services
provided to students is restricted. In Guerrieri , parents brought suit
after
a teacher attempted to cure a student's infectedfinger by placing it in
boiling water. Although citing teachers' in loco parentis relationship
with
students, the Pennsylvania Superior Court concluded "there is nothing
in that relationship which will justify defendants' acts . . . . [T]here
is no
implied delegation of authority to exercise [a teacher's] lay judgment, as
a parent may, in the matter of the treatment of injury or disease suffered
by a pupil." Id. at 241 (citation omitted). But Guerrieri, decided seven
years before the adoption of the School Code, focused on the scope of the
common law concept of in loco parentis authority. Here, the Board is
acting as educator, not in loco parentis. Furthermore, parental approval
here was solicited; parents may decline their children's participation.
Parental authority has not been supplanted.

more extensive services. Plaintiffs assert that the legislature's intent to devise programs for proper hygiene appears only in express statutory provisions.

The omission of condom distribution in the relevant School Code provision on health services, 24 Pa. Stat. S 14–1402, does not reveal a legislative intent to restrict allowable school based health services. The health services listed there include examinations like vision tests, hearing tests, height and weight measurements, and tests for tuberculosis. See also 28 Pa. Code S 23.1 (requiring school districts to provide the following health services:"(1) Medical examinations. (2) Dental examinations. (3) Vision screening tests. (4) Hearing screening tests. (5) Threshold screening tests. (6) Height and weight measurements. (7) Maintenance of medical and dental records. (8) Tuberculosis tests. (9) Special examinations"). But the School Code prescribes "such other tests as the Advisory Health Board may deem advisable to protect the health of the child," 24 Pa. Stat. S 14–1402, suggesting legislative intent to expand school based health services. As prophylactic devices designed to prevent the transmission of disease, condoms constitute a health service designed to protect students, and the concomitant counseling aids that objective.

Indeed, the regulations encourage a curriculum commensurate with the Board's policy. 22 Pa. Code S 5.202(f)(8)(iii) directs school districts to develop a curriculum designed to prepare students to demonstrate their knowledge of the benefits associated with "good personal health habits including health promotion and disease prevention." School districts are also instructed to educate high school students on "wellness andfitness, incorporating physical education, aerobic fitness, regular physical activity and health . . ." 22 Pa. Code S 5.213(c)(9). More importantly, the regulations demand "[i]nstruction regarding prevention of human immunodeficiency virus (HIV) infection/acquired immunodeficiency syndrome (AIDS)." 22 Pa. Code S 5.220(a). The General Assembly entrusts school districts to effectuate this directive. See 22 Pa. Code S 5.220(b) ("Educational materials and instruction [regarding AIDS] shall be determined by the local school district . . .").

28

The School Code also directs that physiology and hygiene be taught to students. See 24 Pa. Stat. S 15-1513. Physiology is "a branch of biology that deals with the functions and activities of life or of living matter (as organs, tissues, or cells)." Webster's Ninth New Collegiate Dictionary 888 (1990). Hygiene is defined as "a science of the establishment and maintenance of health." Id. at 591. By distributing condoms and counseling on abstinence and disease prevention, the Board's policy furthers these goals.

3.

Accordingly, we find the Board did not abuse its discretion in implementing the policy. "Judicial interference with discretionary exercise of a school board power is permissible where the action of the board was based on a misconception of law, ignorance through lack of inquiry into the facts necessary to form an intelligent judgment, or the result of arbitrary will or caprice." Roberts v. Board of Dir. of Sch. Dist. of Scranton, 341 A.2d 475, 480 n.4 (Pa. 1975) (citations omitted). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion, the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence of record, discretion is abused." Man O' War Racing Ass'n, Inc. v. State Horse Racing Comm'n, 250 A.2d 172, 181 n.10 (Pa. 1969).

The General Assembly placed the responsibility for controlling and managing public education with the local school districts. Our examination of the applicable statutes and regulations reveals no misconception by the Board of the breadth of its authority. Rather, the Board here acted within its statutory duties by implementing the policy, and Plaintiffs have presented no evidence of a lack of inquiry, caprice, or arbitrariness. See Downing v. School Dist. of City of Erie, 61 A.2d 133, 135 (Pa. 1948) ("The burden of showing to the contrary, when the action of a school board is challenged with respect to matters committed to its discretion, is a heavy one") (citations omitted).

29

B.

Plaintiffs argue the Board's policy violates their fundamental right to remain free from unnecessary governmental interference with bringing up their children. According to plaintiffs, because the Board's policy not only educates students about safe sex, but also provides the condoms needed to accomplish the activity, the state supplants parental authority. Plaintiffs take issue with the opt out provision because it apparently "requires parents to take action to reclaim their authority and prevent the state from distributing condoms to their children." (Appellants Br. 35). Plaintiffs maintain "[r]equiring consent before distributing condoms leaves parental authority intact unless the parent takes action to give his authority to state officials." (Id.).

"The Supreme Court has long recognized the right of parents to the care, custody and nurture of their children as a liberty interest protected by the Fourteenth Amendment." Doe. v. Irwin, 615 F.2d 1162, 1167 (6th Cir.) (citing cases), cert. denied, 449 U.S. 829 (1980). Equally honored is the principal that parental consent must be secured before medical treatment is obtained:

> Generally, it is for the parent in the first instance to decide what is actually necessary for the protection and preservation of the life of his or her child.

* * *

> Parental consent is further recognized by the exceptions which have been carved out by the legislature, most notably the Minor's Consent to Medical, Dental and Health Services, Act . . . which enumerates where express parental consent is not necessary for the administration of medical treatment . . . (a minor under the age of seventeen cannot donate blood without the prior consent of a parent . . . parental consent is not necessary for the treatment of substance abuse . . . no liability attaches for treatment of a minor venereal disease).

Parents United for Better Schs., Inc. v. School Dist. of Philadelphia, 646 A.2d 689, 692 (Pa. Commw. Ct. 1994) (citations omitted).

We recognize the strong parental interest in deciding what is proper for the preservation of their childrens' health. But we do not believe the Board's policy intrudes on this right. Participation in the program is voluntary. The program specifically reserves to parents the option of refusing their child's participation. (See App. 39-40 ("Parents or guardians of students in schools taking part in the phase-in pilot program shall have the absolute right to veto their child's or children's participation in the program")). Once parents return the opt out form, their child will not be able to receive either counseling or condoms.

The Board's policy contains adequate notice provisions designed to effectively inform parents. "Letters are sent by first class mail to the parents of all ninth graders and to all new students entering high schools which house health clinics or resource rooms." (App. 41). Furthermore, "[p]rior to the initial opening of new resource centers a notice was published in newspapers of communities in which the participating high schools are located. Notice was also broadcast on the School District's cable channel." (Id.).

Although the notice provision requires parents to affirmatively object to their child's participation, it specifically advises (1) that any student who asks for a condom at school may receive one and (2) that students will receive counseling on the importance of abstinence. (See App. 76). Students are not required to seek out or obtain condoms or counseling and may furthermore refuse condoms after counseling.

We find the policy coerces neither parents nor students. The applicable statutes and regulations evince legislative concern regarding the parental liberty interest in raising children. The General Assembly has imposed the following obligation on school districts:

> School districts shall adopt policies to assure that parents have the following:
>
> (1) Access to information about the curriculum, including expected student learning outcomes, instructional materials and assessment techniques.

31

(2) A process for the review of instructional materials.

(3) The right to have their children excused from specific instruction which conflicts with their religious beliefs, upon receipt by the school district of a written request from the parents.

(4) The right to have their children excused from State assessments under S 5.231 (relating to State assessment system) upon receipt by the school district of a written request from the parents.

22 Pa. Code S 5.4. The Board's opt out provision also requires parents to affirmatively exercise their right to object. See also 28 Pa. Code S 23.84(b) ("Children need not be immunized if the parent, guardian or emancipated child objects in writing to the immunization on religious grounds or on the basis of a strong moral or ethical conviction similar to a religious belief ").

The General Assembly envisaged that some parents may object to AIDS instruction, and, to ensure parental control, specifically crafted an exception to the regulation directing AIDS education:

A school district shall excuse a pupil from HIV/AIDS instruction when the instruction conflicts with the religious beliefs or moral principles of the pupil or parent or guardian of the pupil and when excusal is requested in writing. Prior to the commencement of instruction, a school district shall publicize that detailed curriculum outlines and curricular materials used in conjunction with the instruction are available to parents and guardians during normal school hours or at teacher-parent conferences. Curricular materials, if practical, shall be made available by the school district for home instruction use by a parent or guardian of a student excused from the district's HIV/AIDS instruction.

22 Pa. Code S 5.221(c). In accordance with this provision's direction, the Board allows parents to refuse participation.

32

C.

A brief examination of the relevant case law supports our conclusion. In Doe, the United States Court of Appeals for the Sixth Circuit assessed a condom distribution program offered by a county health department in conjunction with the Michigan Department of Public Health. Minors were given contraceptives without regard to either age or parental consent, and services were not advertised. The county conducted weekly "rap sessions" to discuss birth control methods and responsibilities associated with sexual activity. No minor received condoms without attending a rap session, and parents were encouraged to attend if they inquired, but no effort was made to seek their attendance. In upholding the constitutionality of the program, the Sixth Circuit stated:

> The State of Michigan, acting through the Center and defendants, has imposed no compulsory requirements or prohibitions which affect rights of the plaintiffs. It has merely established a voluntary birth control clinic. There is no requirement that the children of the plaintiffs avail themselves of the services offered by the Center and no prohibition against the plaintiff's participating in decisions of their minor children on issues of sexual activity and birth control. The plaintiff 's remain free to exercise their traditional care, custody and control over their emancipated children . . . . we find no deprivation of the liberty interest of parents in the practice of not notifying them of their children's voluntary decisions to participate in the activities of the Center.

Doe, 615 F.2d at 1168. The program here is also voluntary and provides for parental notification.

Curtis v. School Comm'n of Falmouth, 652 N.E.2d 580 (Mass. 1995), cert. denied, 516 U.S. 1067 (1996) involved a condom distribution program in junior and senior high schools. The program did not contain an opt out provision, and plaintiffs requested provisions (1) allowing parents to opt out of the program and (2) notifying parents of their childrens' request for a condom. Counseling was provided to students who requested it, and abstinence was stressed.

33

Before receiving condoms, students were counseled and supplied with pamphlets on AIDS and other sexually transmitted diseases. Students could either request free condoms from the nurse or purchase them in bathrooms.

Holding that the "[p]ublic education of children is unquestionably entrusted to the control, management, and discretion of State and local school committees," the court concluded the program did not violate parents' constitutional rights:

> [w]e discern no coercive burden on the plaintiffs' parental liberties in this case. No classroom participation is required of students. Condoms are available to students who request them and, in high school, may be obtained from vending machines. The students are not required to seek out and accept the condoms, read the literature accompanying them, or participate in counseling regarding their use. In other words, the students are free to decline to participate in the program. No penalty or disciplinary action ensues if a student does not participate in the program. For their part, the plaintiff parents are free to instruct their children not to participate . . . . Although exposure to condom vending machines and to the program itself may offend the moral and religious sensibilities of plaintiffs, mere exposure to programs offered at school does not amount to unconstitutional interference with parental liberties without the existence of some compulsory aspect of the program.

\* \* \*

> Because we conclude the program lacks any degree of coercion or compulsion in violation of the plaintiffs' parental liberties, or their familial privacy, we conclude also that neither an opt out provision nor parental notification is required by the Federal Constitution.

Id. at 586 (also finding the program is not coercive simply because it occurs in public school where attendance is mandatory). Significantly, the program here contains the opt out provision the Curtis plaintiffs requested.

34

Alfonso v. Fernandez, 606 N.Y.S.2d 259 (N.Y. App. 1993) which reached the opposite conclusion, involved a mandatory program.

> [The program] calls for the high schools to make condoms available to students who request them. Public high schools are to establish resource rooms where trained professionals are to dispense condoms to students who request them. A student to whom condoms are dispensed must be given personal health guidance counseling involving the proper use of condoms, and the consequences of their use or misuse. Students are not required to participate in this component of the program and no sanction is imposed on a student who does not do so. Most importantly, this component of the respondent's program does not include a provision for parental consent or op-out.

Id. at 261 (emphasis supplied).8  The key distinction of course is that the New York program was mandatory. Parents were not given the opportunity to opt out.

IV.

We hold the Philadelphia School Board, by implementing the policy, acted within its statutory and regulatory authority and effectuated its educational mandate. In

_____

8. The court's decision to strike down the program rested on these conclusions:

> No judicial or legislative authority directs or permits teachers or other public school educators to dispense condoms to minor, unemancipated students without the knowledge or consent of their parents. Nor do we believe that they have any inherent authority to do so.

* * *

> We do not find that the policy is essential. No matter how laudable its purpose, by excluding parental involvement, the condom availability component of the program impermissibly trespasses on the petitioner's parental rights by substituting the respondents in loco parentis, without a compelling necessity therefor.

Id. at 263-65 (citations omitted).

35

enacting a voluntary program, the Board did not offend parental rights regarding the custody and care of their children. In light of parents' ability to opt out of the program, we need neither assess the privacy rights of minors to contraceptives, nor balance this privacy right, if any, against the interests of parents and the Commonwealth in the health and welfare of children. Therefore, we need not reach this constitutional issue addressed by the district court.

For the foregoing reasons, we will affirm the judgment of the district court.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit